58 P.3d 1257

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Alicia DIAZ, Defendant–Appellant.**

No. 23860.

Supreme Court of Hawai'i.

Dec. 10, 2002.

212

Emmanuel G. Guerrero, on the briefs, for defendant-appellant.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and ACOBA J., dissenting.

Opinion of the Court by NAKAYAMA, J.

Defendant-appellant Alicia Diaz (Diaz) appeals from the judgment of the first circuit court, the Honorable Karen S.S. Ahn presiding, convicting her of promoting a dangerous drug in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1242 (1993),[1] and unlawful possession of drug paraphernalia, in violation of HRS § 329–43.5(a) (1993).[2] On appeal, Diaz argues that the trial court erred when it: (1) denied her motion to suppress evidence obtained during

1. HRS § 712–1242 provides in relevant part:
 (1) A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly:
 (a) Possesses twenty-five or more capsules, tablets, ampules, dosage units, or syrettes, containing one or more dangerous drugs; or
 (b) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
 (i) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers; or
 (ii) One-fourth ounce or more, containing any dangerous drug; or
 (c) Distributes any dangerous drug in any amount.

2. HRS § 329–43.5(a) provides:
 (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

an illegal search; (2) denied her motion to dismiss charges for violation of Hawai'i Rules of Penal Procedure (HRPP) Rule 48; and (3) denied her right to a fair trial and due process resulting from the cumulative effect of errors that occurred throughout the trial. We hold that: (1) the police officers validly executed the search warrant; (2) the prosecution exercised due diligence in its attempts to locate Diaz to serve the bench warrant and the number of excludable days resulted in trial commencing within the 180 days required by HRPP Rule 48; and (3) Diaz's argument that the cumulative effect of instances of prejudicial error and misconduct denied her right to a fair trial is without merit.

## I. BACKGROUND

On December 4, 1998, a search warrant for the premises of the Fil–Am Video store was executed. At approximately 6:45 p.m., police officers and detectives with the Honolulu Police Department (HPD) arrived at the video store during regular business hours.[3] The detectives observed an unidentified man leaving the video store and requested that he re-enter the store. The detectives followed this man into the store, and, upon entering, the detective identified his office and stated that he was executing a search warrant. The detective asked one of the customers if a door located on the "makai"[4] side of the store was an office door. After receiving an affirmative response, HPD Officer William Richardson testified that he "approached that door and [ ] knocked three separate times announcing myself, and the purpose

being there with the search warrant, and there was no—no one came to the door to open it." Specifically, the officer stated, "[P]olice department, search warrant." After waiting approximately fifteen seconds, he turned to his sergeant and was instructed to break the door. The office door was then kicked in.

Upon breaking the door, the officers discovered Diaz standing in front of a desk holding a white unsealed envelope. Diaz then dropped the envelope on the floor, stating that she had "just found that particular envelope on the ground." Inside the unsealed envelope that fell to the floor were baggies that the officers identified as resembling "ice." Diaz's name was written on the outside of the envelope.

On October 27, 1999, Diaz was indicted on one count of promoting a dangerous drug in the second degree and one count of unlawful use of drug paraphernalia. A grand jury issued a bench warrant on October 28, 1999. On January 12, 2000, Diaz was served with the bench warrant for her arrest. On July 31, 2000, Diaz was convicted as charged. This timely appeal followed.

### A. HRPP Rule 48 motion to dismiss

On July 18, 2000, Diaz filed a motion to dismiss charges for violation of HRPP Rule 48.[5] A hearing commenced on July 21, 2000, in which Diaz argued that the deputy sheriff's efforts to locate Diaz did not amount to due diligence. As evidence for this argument, Diaz noted that the deputy sheriff completed a computer check, but failed to check with the post office, the phone company,[6] or white pages of the telephone book.

---

3. It is uncontested that there was an "open" sign in the window of the store and the store was open to the public for business.

4. "Makai" means "on the seaside, toward the sea, in the direction of the sea." Mary Kawena Pukui & Samuel H. Elbert, Hawai'ian Dictionary 114 (Rev. ed.1986).

5. HRPP Rule 48 provides in relevant part:
 (b) By court. Except in the case of traffic offenses that are not punishable by imprisonment, the court shall, on motion of the defendant, dismiss the charge, with or without

prejudice in its discretion, if trial is not commenced within 6 months:
 (1) from the date of arrest if bail is set or from the filing of the charge, whichever is sooner, on any offense based on the same conduct or arising from the same criminal episode for which the arrest or charge was made[.]

6. The deputy sheriff testified that the phone records are confidential and the phone company will not release them.

Diaz argued that she had reported the theft of her car to the police on November 15, 1999 and at that time had given the correct address. She further argued that on December 10, 1999 she had been involved in a minor traffic accident and had given the police her address. The prosecution argued that the deputy went to three different addresses. Neighbors at two locations had no knowledge of Diaz. The third address was a closed road. Finally, the prosecution argued that the deputy completed monthly computer checks. The trial court concluded that the "77 days that it took for the sheriffs to serve the grand jury bench warrant upon the defendant ... [was] based upon the unavailability of the Defendant." The prosecution had requested a continuance of the trial on March 10, 2000 because a material witness was going to school on the mainland and unable to attend trial until the summer break. At the hearing, both defense counsel and Diaz consented to continuing the trial until the summer. The trial court denied the motion to dismiss charges finding that 125 days remained to try the case under HRPP Rule 48.

## B. Motion to suppress evidence collected during the search of the Fil–Am Video store

On July 27, 2000, the second day of trial, Diaz filed a motion to suppress evidence collected during the execution of the search warrant at the Fil-Am Video store. The prosecution argued that HRPP Rule 12(f) [7] provides that pretrial issues such as motions to suppress are deemed waived if not raised before trial. The trial court ruled that there was no good cause shown to grant relief because "both counsel had full discovery," both counsel "had full access to the defendant," and a motion could have been "put forth within the deadline required."

7. HRPP Rule 12(f) provides:
 (f) Effect of failure to raise defenses or objec-.tions. Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, within the time set by the court pursuant to section (c), or within any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

## C. Motion to suppress evidence of other search warrants

Prior to trial commencing, Diaz filed a motion in limine seeking the exclusion of certain evidence, including reference to the search warrant addressed to Diaz.[8] The trial court limited the reference to the search warrant addressed to the Fil-Am Video store. The following exchange occurred among the court, defense counsel, and the prosecutor:

THE COURT: ... [Prosecutor], I think considering, among other things, that there are two, I'm going to deny your request to submit written documents into evidence and grant the defendant's motion to exclude them. I think the State does have obviously a legitimate right to show the jury that the police acted properly, shall we say, so you may, you know, elicit testimony with respect to the existence of the search warrant.

With respect to the search warrant that permitted police to search the defendant, I would prefer that you—that perhaps you can lead and just keep it down to 'pursuant to search warrant, did you search the defendant.'

. . . .

DEFENSE COUNSEL: Your Honor, so that I do not overly mention the fact of the search warrant to the jury, I would ask this Court if I could have a running objection to even the mention of a search warrant with respect to the search of the defendant.

. . . .

DEFENSE COUNSEL: The search warrants with respect to 3480 Salt Lake Boulevard, or her residence, nothing was found there.

8. Apparently, two search warrants were issued by the same judge, to the same investigator, and upon the same facts. The warrant for the Fil-Am Video store had the name Aris Garcia on it. The other warrant was for Diaz's residence.

THE COURT: Okay, I think—unless the Defense wants that in, I think that's irrelevant, and I'm going to ask [prosecutor] not even to talk about two search warrants, one for her home, one for this individual, the man, whoever he may be.

DEFENSE COUNSEL: And that's precisely the point. The search warrant that in fact recovered the illicit items, it was not addressed specifically with respect to Ms. Diaz, so if the prosecuting attorney will start asking questions with respect to did you search the defendant with regards to that search warrant, there will be the impression by the jury that that particular search warrant for Fil–Am Video was addressed for Ms. Diaz, and that's not the case. That search warrant was addressed to Aris Garcia, not Ms. Diaz.

. . . .

PROSECUTION: Your Honor, the State's not going to over-emphasize it. It's just going to ask the officers were you there pursuant to a search warrant, were you executing a search warrant, and that's it.

THE COURT: All right.

DEFENSE COUNSEL: And then I'd like to be free at that point to expand on that particular search warrant for the Fil–Am Video to point out to the officer that in fact the attention or focus of that search warrant was not Ms. Diaz, but someone else.

PROSECUTOR: I'm going to object to that, Your Honor. He can't have part of it coming in.

THE COURT: It's up to you, [defense counsel]. But, you know, if you open the door, then—you know, I don't know what you're going to ask or what the answer may be.

## D. Trial

### 1. Officer Bumanglag's improper reference to search warrant.

Trial commenced on July 26, 2000. During direct examination the prosecution asked Of-

ficer Bumanglag "[n]ow, were you assigned to execute a search warrant on December 4, 1998?" After receiving an affirmative answer, the prosecutor asked where the warrant was executed. No further reference by the prosecution was made regarding the warrants. During cross-examination, defense counsel questioned Officer Bumanglag about the search warrant. Officer Bumanglag testified that Diaz was the subject of a search warrant. Defense counsel then asked, "[N]ow, if I were to tell you that the warrant itself made no reference to Alicia Diaz, would that be correct?" The prosecution objected and asked that the document be marked for identification. After viewing the document, the prosecutor objected because defense counsel was not using the complete warrant.[9] Defense counsel argued that the purpose of introducing that part of the warrant was to impeach Officer Bumanglag by demonstrating that Diaz's name was not on that warrant. The court permitted defense counsel to submit the warrant over the prosecution's objection. Questioning again proceeded with the following exchange:

DEFENSE COUNSEL: Officer Bumanglag, again, on December 4, 1998, you saw the warrant, you read the warrant, right?

BUMANGLAG: Yes.

DEFENSE COUNSEL: And if I were to tell you that there is no mention of an Alicia Diaz, would that be correct?

. . . .

BUMANGLAG: Not on that search warrant.

DEFENSE COUNSEL: Your Honor, I object. May I approach?

Your Honor, I would move for a mistrial. There was a clear instruction by this Court that there is to be no mention of the second warrant until I open the door. I have not opened the door.

THE COURT: [Defense Counsel] you're on dangerous ground.

---

9. Both of the warrants were attached as one document, containing several pages. Defense counsel removed the warrant for Fil–Am Video store and sought to introduce only that part.

The trial court ruled that the answer came from the witness and that it was not unreasonable, given the fact that there were two warrants. The trial court subsequently denied the motion for mistrial. Defense counsel continued questioning Officer Bumanglag, eliciting testimony that the warrant for Fil-Am Video store was not addressed to Diaz.

### 2. Testimony regarding chain of custody and content of evidence found at Fil-Am Video and on Diaz

The prosecution questioned HPD Officer Shirley Brown regarding the weight and contents of several baggies containing crystal methamphetamine. Officer Brown testified as to the chain of custody for baggies identified as exhibits 28, 29, 30, and 31. Each piece of evidence was found at the Fil-Am Video store in the possession of Diaz. The combined weight of these exhibits was 4.92 grams. HPD Officer Akina testified as to the chain of custody for exhibit number 4, which was discovered on Diaz during a search of her person and an inventory search at the police station. The search of Diaz's person was delayed until a female officer was present to complete the search. Officer Akina made a written report indicating what was found during the search, but testified that the hard copy of the report was lost and it was not standard operating procedure to make backups on the computers.

Defense counsel objected to this testimony, arguing that the defense had a right to the police report and that "if police reports or discovery is destroyed or lost for whatever reason, then this Court can strike the testimony." Defense counsel further argued that since Diaz was searched at the scene and the baggie was not found, and then searched again at the police station and the baggie was then found, the veracity of the officer's testimony was legitimately in question. The prosecution stated that there were no female officers at the scene, and, therefore the search at the police station was more thorough. The court admitted the testimony and requested that the prosecution ask Officer Akina to search for the report. Officer

Brown testified as to the weight and content of exhibit number 4. The weight of exhibit number 4 was .263 grams and the combined weight of all of the exhibits was 5.189 grams.

### 3. Defense witness

The only witness Diaz called was Marissa Rosqueta, whose presence was compelled by subpoena. The trial court made a deputy public defender (DPD) available to Rosqueta because she was present at the Fil-Am Video store when the police executed the search warrant and drug paraphernalia was found in her vicinity. Rosqueta exercised her constitutional right not to testify pursuant to the fifth amendment to the United States Constitution. Diaz then requested that the court order the prosecution to either offer Rosqueta immunity for her testimony or that the prosecution seek an indictment against her. The court refused to do so. Diaz was subsequently convicted of promoting a dangerous drug in the second degree and unlawful possession of drug paraphernalia. This timely appeal followed.

## II. STANDARDS OF REVIEW

### A. Motion to Suppress

■ "The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Pattioay*, 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995) (citation omitted).

### B. Dismissal Under HRPP Rule 48

■ When reviewing a trial court's denial of an HRPP Rule 48 motion to dismiss, we apply both the "clearly erroneous" and "right/wrong" tests:

> A trial court's findings of fact (FOFs) in deciding an HRPP Rule 48(b) motion to dismiss, are subject to the clearly erroneous standard of review.... However, whether those facts fall within HRPP Rule 48(b)'s exclusionary provisions is a question of law, the determination of which is

freely reviewable pursuant to the "right/wrong" test.

> *State v. Samonte,* 83 Hawai'i 507, 514, 928 P.2d 1, 8 (1996) (quoting *State v. Hutch,* 75 Haw. 307, 328–29, 861 P.2d 11, 22 (1993)).

> *State v. White,* 92 Hawai'i 192, 198, 990 P.2d 90, 96 (1999) (alterations in original).

*State v. Lei,* 95 Hawai'i 278, 281–82, 21 P.3d 880, 883–84 (2001).

## C. Admissibility of Evidence

 "We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Culkin,* 97 Hawai'i 206, 213, 35 P.3d 233, 240 (2001) (citations omitted). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citations omitted).

## III. DISCUSSION

## A. The court did not err when it denied Diaz's motion to suppress evidence because the search warrant was validly executed.

Diaz argues that the "clear terms of HRS § 803–37 [ (1993) ][10]" required HPD to knock and announce (1) when entering the video store through the unlocked closed door; and (2) when entering the interior office through the locked closed door. Diaz's first argument fails because there is no objectively reasonable expectation of privacy to the

publicly accessible areas of a commercial establishment, such that the provisions of HRS § 803–37 are triggered upon entering the exterior doors of a commercial establishment that is open for business. Thus, HPD was not required to knock and announce at the exterior doors of the Fil–Am Video store. Diaz's second argument also fails because HRS § 803–37, by its plain language, is inapplicable to the interior doors of "stores." Nonetheless, there is an objectively reasonable expectation of privacy at the interior office door of a store, requiring that police give reasonable notice of their presence and authority. We hold that HPD officers gave Diaz reasonable notice when they effectively demanded entry to the locked interior door concealing Diaz and that the demand was effectively refused.

1. **Because there can be no objectively reasonable expectation of privacy at the exterior doors of a commercial establishment that is open to the public for business, thereby triggering HRS § 803–37, the police were not required to knock and announce before entering the Fil–Am Video store.**

 At issue here is whether, on the present record, the provisions of HRS § 803–37 were triggered by a reasonable expectation of privacy at the exterior doors of a commercial establishment open to public ingress and egress during normal business hours. We answer in the negative.

 We have recognized that the Hawai'i Constitution protects privacy under article I, section 7.[11] The purpose of article I, section 7 is to safeguard individuals from the arbitrary, oppressive, or harassing conduct of

---

10. HRS § 803–37 provides:

The officer ·charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. When entered, the officer may demand

that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them.

11. Hawai'i Constitution article I, section 7 provides:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of

government officials. *State v. Harada,* 98 Hawai'i 18, 28, 41 P.3d 174, 184 (2002); *see also State v. Eleneki,* 92 Hawai'i 562, 566, 993 P.2d 1191, 1195 (2000). HRS § 803–37 gives rise to the knock and announce rule, which is one mechanism that guards this right.

■ This court expressly laid out the necessary procedure, pursuant to HRS § 803–37, for police to lawfully break an exterior door. Specific conduct is required, particularly when entering a *home,* because "[t]here is no question that a person generally has an actual, subjective expectation of privacy in his or her home. Nor is there any question that the expectation of privacy in one's home is one that society recognizes as objectively reasonable." *State v. Lopez,* 78 Hawai'i 433, 442, 896 P.2d 889, 898 (1995). In *Harada,* this court stated that "[w]here the knock and announce rule has been triggered, the police are required to declare their office, their business, and expressly demand entry." *Id.* at 29, 41 P.3d at 186.

■ The power of the authorities executing a search warrant was statutorily defined in, and has remained unchanged since, 1870. *See* Hawai'i Penal Laws c. 48 § 540 (1897).[12] Absent specific reasoning by the legislature, this court must adopt an interpretation that is in accord with the plain meaning of the statute. *See Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 136–37, 883 P.2d 38, 57–58 (1994). HRS § 803–37, by its terms, would appear to mandate compliance with the knock and announce rule when entering a store whose doors are unlocked and shut. In *Dawes,* however, this court recognized that the utility of a legislative history may lie, not in the specific meaning of the language used, but "what it reveals about the concerns that were before [the legislature] when the statute was being worded[.]" *Dawes,* 77 Hawai'i at 137, 883 P.2d at 58.

The search warrant serves to protect individuals' constitutional right to be "secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." Hawai'i Const. art. I, § 7. In extending the expectation of privacy beyond the home, this court has recognized that what is and is not protected necessitates a case-by-case analysis of the environment and the meaning of the statutory language. In this vein, this court has been loath to assign a meaning to statutory language that results in an absurd conclusion. In *Franks v. City & County of Honolulu,* 74 Haw. 328, 341, 843 P.2d 668, 674 (1993), this court stated that "even absent statutory ambiguity, departure from literal construction is justified when such construction would produce an absurd and unjust result and the literal construction in the particular action is clearly inconsistent with the purposes and policies of the act." (quoting *Hawai'ian Ins. & Guar. Co. v. Financial Sec. Ins. Co.,* 72 Haw. 80, 807 P.2d 1256 (1991)). For example, it is absurd to allege that people in a large department store in a large shopping mall could legitimately claim a reasonable expectation of privacy in the common areas of the store.

We have been unable to identify any case law supporting Diaz's proposition that the government must "knock and announce" before entering the public areas of a business during normal business operations. Federal courts addressing this specific issue have held that an implied invitation to enter a business negates the policy and purpose of the knock and announce rule. In *United States v. Little,* 753 F.2d 1420, 1435–36 (9th Cir.1984), the United States Court of Appeals for the Ninth Circuit held that there is no duty to knock and announce upon entering an open business or office. A California federal district court stated that, inasmuch as the evidence was uncontroverted that the business establishment was open, there was no duty to knock and announce. *Meredith v.*

privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

12. No legislative history exists clarifying why the House of Nobles and Representatives adopted this language. *See* Journal of the Legislature

1841–1850, 1850 at 111. In the report of William L. Lee, the individual tasked with developing the penal code, there is only reference to his reliance on the penal codes of Massachusetts and Louisiana for guidance. Penal Code Session Laws 1850, Report by Wm. L. Lee. A search of these codes did not reveal express language referencing shops and stores.

*Erath*, 182 F.Supp.2d 964, 975 (C.D.Cal. 2001).[13]

In the present case, the police were entering a store with a valid search warrant.[14] The store was open for business and an "open" sign was posted in the front window.[15] The initial entry was into a part of the store that was a designated area for the public. In fact, customers were in that area when the police arrived. Therefore, there could be no objectively reasonable expectation of privacy at the exterior doors or in the public areas of the commercial establishment, which was open to public ingress and egress during regular business hours. Consequently, we hold that the police, when executing the search warrant, were not required to knock and announce when entering the exterior door.

2. **HRS § 803–37 is inapplicable to an interior office door of a commercial establishment open for business; however, as a constitutional matter, the police must give reasonable notice of their presence and authority before breaking an interior office door to a space that is manifestly not open to the public.**

 HRS § 803–37 is inapplicable to an interior office door of a commercial establishment open for business. However, because a reasonable expectation of privacy exists at an interior office door of a commercial establishment open for business, police are required to give reasonable notice of their presence and authority. In this case, we hold that the police gave reasonable notice when they knocked three times, announced "police department, search warrant," and waited fifteen seconds before forcibly entering the interior office door of the Fil–Am Video store.

Our first inquiry is whether HRS § 803–37 applies to the interior office door of a commercial establishment open for business. We answer in the negative. When referring to the exterior doors of the place to be searched, the statute's plain language includes the word "store." [16] When referring to the interior doors, the statute states, "[W]hen entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may

13. There do not appear to be any other states that employ the term "store" in their "knock and announce" statutes. Although Hawai'i's first Chief Justice, William Lee reported that he relied on the Massachusetts penal code when drafting the code ultimately adopted in the Kingdom of Hawai'i, there did not appear to be language in either the statutes or case law applying the "knock and announce" rule to stores. *See Commonwealth v. Cundriff*, 382 Mass. 137, 415 N.E.2d 172, 177 (1980) ("[H]istory teaches that the announcement requirement is part of our common law."). "Knock and announce" in Massachusetts derives from the common law, not statutory law. In *McLennon v. Richardson*, 81 Mass. 74, 15 Gray 74 (1860), "the court stated that the authority of a police officer to break into a house or *shop* and make an arrest without a warrant was limited to cases involving felonies, treason, or breaches of the peace[.]" *Cundriff*, 415 N.E.2d at 177 n. 12 (quoting *McLennon*, 81 Mass. 74, 15 Gray 74) (emphasis added). The factual scenario in *McLennon* was significantly different than the present case and actually supports a conclusion that the "knock and announce" in the context of stores should be limited to non-business hours. In *McLennon*, the police "forcibly enter[ed] a shop at midnight preceding the Lord's day." *McLennon*, 81 Mass. 74, 15 Gray 74. The dispositive factors in finding the entrance illegal were the time of day, the business was not open to the public, and the day itself. *See also People v. Pompa*, 212 Cal.App.3d 1308, 261 Cal.Rptr. 417, 419 (1989) ("[T]he entry was to an office which was part of a business establishment, premises entitled to a lesser expectation of privacy[.]").

14. The defendant does not argue that there was no probable cause to support the issuance of the search warrant or that there was any type of fatal error in the warrant itself.

15. The effect of posting an "open" sign in the front window and unlocking the entrance to the public area of the store created an implied invitation to enter the store. *See Littleton v. State*, 66 Haw. 55, 68 n. 4, 656 P.2d 1336, 1345 n. 4 (1982) (explaining that "[a]n invitation may be implied from a continued and general custom in using the premises by the patrons of the business").

16. As explained in section III(A)(2) of this opinion, we hold today that applying HRS § 803–37 to an exterior door of a "store" that is open for business would produce an absurd result; thus, police are not required to knock, announce, and demand entrance at the exterior door of such a store during its business hours.

break them." HRS § 803–37. Because the word "store" is omitted from the part of HRS § 803–37 governing the interior doors of the place to be searched, the statute does not apply to the interior office door of the Fil-Am Video store and thus HRS § 803–37 could not be triggered.

Because HRS § 803–37 does not apply, a constitutional analysis is necessary. The fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution protect individuals from "arbitrary, oppressive, and harassing conduct on the part of government officials." *State v. Bonnell*, 75 Haw. 124, 136–37, 856 P.2d 1265, 1272–73 (1993) (citations and internal quotations marks omitted). Thus, we must next determine whether there was an objectively reasonable expectation of privacy at the interior office door of a commercial establishment open for business, and, if so, whether the police provided reasonable notice of their presence and authority.

We hold that an objectively reasonable expectation of privacy exists at an interior office door of a commercial establishment open for business. This court adopted the two-part test of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), to determine if a person's expectation of privacy is reasonable. *Bonnell*, 75 Haw. at 139, 856 P.2d at 1274. "First, one must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable." *Id.* (citations and internal quotations omitted).

The first part of the test is satisfied because Diaz exhibited an actual, subjective expectation of privacy by closing and locking the office door. In *State v. Biggar*, 68 Haw. 404, 407, 716 P.2d 493, 495 (1986), this court held that a reasonable expectation of privacy was exhibited when the defendant closed the bathroom stall door. In *State v. Kaaheena*, 59 Haw. 23, 29, 575 P.2d 462, 467 (1978), this court held that a reasonable expectation of

privacy was exhibited where gambling activity was shielded from a passerby's view by closed venetian blinds and drawn curtains. In the instant case, Diaz closed and locked the office door and her activities were shielded from the view of anyone inside the store. Thus, Diaz exhibited an actual, subjective expectation of privacy.

The second part of the test is satisfied because Diaz's expectation of privacy was one that society would recognize as objectively reasonable. In *Biggar*, 68 Haw. at 407, 716 P.2d at 495, this court stated that "it is beyond dispute that an expectation of privacy in a closed toilet stall is one that society would recognize as objectively reasonable." Similarly, society would recognize an expectation of privacy in a closed, locked office door as objectively reasonable.

Finally, our analysis turns to the reasonableness of the government's intrusion. In *Wilson v. Arkansas*, 514 U.S. 927, 932, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995), the United States Supreme Court noted that "an examination of the common law of search and seizure leaves no doubt that the reasonableness of a search ... may depend in part on whether law enforcement officers announced their presence and authority prior to entering." The Supreme Court then held that the common law principle of announcement "is an element of the reasonableness inquiry under the Fourth Amendment." *Id.* at 934, 115 S.Ct. 1914. Thus, the ultimate issue is whether the police gave reasonable notice of their presence and authority prior to entering the closed office door of the Fil–Am Video store so as not to violate Diaz's protection against unreasonable searches and seizures. This court answers in the affirmative.

In arriving at this conclusion, we consider whether the police behavior was reasonable under the circumstances and whether the purposes behind the knock and announce rule were furthered. *State v. Monay*, 85 Hawai'i 282, 285, 943 P.2d 908, 911 (1997) (Ramil, J., concurring and dissenting). The police behavior was reasonable under the

circumstances because the officers announced their presence and authority and waited a reasonable time before entering. The police knocked three times, announced "police department, search warrant," and waited fifteen seconds before entering the interior office door.

■ Absent exigent circumstances, the police must allow a reasonable time for the occupants to respond before forcing entry. In *State v. Garcia*, 77 Hawai'i 461, 469, 887 P.2d 671, 679 (1995), this court found that a ten-second delay between announcement and forced entry was insufficient at the outer door of a residence. *Id.* at 469, 887 P.2d at 679. However, in *United States v. Spriggs*, 996 F.2d 320, 323 (D.C.Cir.1993), *cert. denied*, 510 U.S. 938, 114 S.Ct. 359, 126 L.Ed.2d 323 (1993), the United States District Court for the District of Columbia held that "the agents were justified in concluding that they had been constructively refused admittance when the occupants failed to respond within 15 seconds of their announcement." Under the circumstances of this case, expecting the occupant of the interior office to be alert and responsive during business hours is reasonable. Thus, because Diaz failed to respond within fifteen seconds, the police reasonably forced entry.

Furthermore, the purposes behind the knock and announce rule were fully served. In *Harada*, 98 Hawai'i at 27, 41 P.3d at 184, this court reiterated that the purposes of the knock and announce statute were "(1) to reduce violence to both occupants and police resulting from an unannounced entry, (2) to prevent unnecessary property damage, and (3) to protect an occupant's right to privacy." In the present case, the officers knocked three times, announced "police department, search warrant," and waited fifteen seconds before forcing entry. The police gave notice of their presence, authority, and impending intrusion. They also allowed fifteen seconds for Diaz to respond to avoid violence and damage to property. By not responding,

Diaz evinced constructive refusal, allowing the police to enter by force. By their actions, the police fully served the purposes of the knock and announce rule.

In summary, we hold that HRS § 803–37 does not apply to the interior office door of a store. We further hold that an objectively reasonable expectation of privacy exists at the interior office door of a store, thereby requiring the police to provide reasonable notification of their presence and authority before making a forced entry. In this case, the police satisfied this requirement by knocking three times, announcing "police department, search warrant," and waiting fifteen seconds before forcibly entering the locked interior office door of the Fil–Am Video store.

**B. The trial court properly calculated the excludable days between the indictment and commencement of trial.**

Diaz argues that the trial court erred on two points when it denied her motion to dismiss pursuant to HRPP Rule 48. First, she argues that the 208 days the trial court found excludable was error because the prosecution failed to demonstrate due diligence in serving the grand jury bench warrant. Second, Diaz argues that she never waived her right to a speedy trial or her rights under HRPP Rule 48.

**1. The prosecution exercised due diligence in serving Diaz.**

■ Diaz argues that the trial court abused its discretion in failing to dismiss the charges because the grand jury indictment was filed on October 27, 1999, she was not served with the bench warrant until January 12, 2000, and trial did not begin until July 26, 2000. She argues that the prosecution failed to prove by a preponderance of the evidence that the delays should be excluded. The trial court's findings of fact stated that:

1. The Defendant ... was indicted ... on October 27, 1999.

2. Defendant's Motion for Dismissal for violation of HRPP Rule 48 was filed . . . on July 18, 2000[.]

3. The total number of days elapsed from October 27, 1999, to July 17, 2000, is 263 days.

4. Subtracting 180 days, there is a balance of 83 days.

5. 208 days are excluded.

6. 125 days remain to run under Rule 48.

The trial court's conclusions of law stated:

1. 77 days that it took for the sheriffs to serve the grand jury bench warrant upon . . . [Diaz] [were] based upon the unavailability of [Diaz].

2. The 131 days from March 1, 2000, to July 10, 2000 are excluded because [Diaz] did not object and did consent to the continuance of trial requested by the State.

Because the prosecution evidenced sufficient diligence in serving the bench warrant, the trial court did not err in calculating excludable days.

▮ This court has consistently stated that

HRPP Rule 48(b) mandates the dismissal of criminal charges if a trial on those charges does not commence within six months, construed as one hundred eighty days, from the time of the arrest or of filing of charges, whichever is sooner. *State v. Hoey,* 77 Hawai'i 17, 28, 881 P.2d 504, 515 (1994). Pursuant to HRPP Rule 48(c), however, certain periods must be excluded from the computation of the six month period.

*State v. Jackson,* 81 Hawai'i 39, 50, 912 P.2d 71, 82 (1996). Thus, to determine whether dismissal was required under HRPP Rule 48, the start date and all excludable periods must be identified. *See State v. Dwyer,* 78 Hawai'i 367, 893 P.2d 795 (1995). It is uncontested in the instant case that the indictment was filed on October 27, 1999 and is the date that triggers HRPP Rule 48(b)(1).

It took the sheriff's deputy seventy-seven days to serve the bench warrant on Diaz. During the hearing on the motion to dismiss charges pursuant to HRPP Rule 48, the prosecution questioned sheriff's deputy, Cathy Miyata. Deputy Miyata testified that her first action, after being assigned the bench warrant, was to "check the OCCC [O'ahu Community Correctional Center] log to see if the defendant might be in OCCC." She then explained that the deputies' standard action is to request a photo from the HPD, if a photo is available. There was no photo of Diaz at that time. Deputy Miyata was unable to locate Diaz during the month of November based upon the efforts described above. Deputy Miyata then "submitted a welfare" [17] and completed an address summary. At each of the addresses listed for Diaz, Deputy Miyata was unable to find anyone who knew of Diaz. On January 10, 2000, Deputy Miyata completed another computer check and discovered an Ala Ilima Street address. No one was home when Deputy Miyata made the first visit to this address. On the second visit, an unidentified person was home, which led to Deputy Miyata serving the bench warrant on Diaz.

During cross-examination, Deputy Miyata admitted that she had not checked with the post office for a forwarding address, did not look in the white pages of the phone book, or call the telephone company. When questioned about the addresses she visited prior to finding Diaz, Deputy Miyata stated that one address was discovered when Diaz had listed it in paperwork related to a minor traffic accident. Deputy Miyata went to that address and no one knew Diaz. The other address was listed on the bench warrant, but the resident manager at that address had no information on Diaz. A third address that "came up under [Diaz's] name" was discovered to be a closed road.

---

**17.** The transcripts and the record did not provide a definition for the phrase "submitted a welfare." Presumably, it means that the officer submitted Diaz's name for a computer check into whether she was receiving any assistance from the state.

In *Lei*, 95 Hawai'i at 285, 21 P.3d at 887, we cited, with approval, an ICA decision in which the diligence of the prosecutor was at issue. *See State v. Mageo*, 78 Hawai'i 33, 889 P.2d 1092 (App.1995). The factors identified by the *Mageo* court, and relied upon in *Lei*, included the complete absence of an explanation for the delay in the record, no offer of proof at the hearing to explain the delay, and the availability of the defendant. *Lei*, 95 Hawai'i at 285, 21 P.3d at 887 (quoting *Mageo*, 78 Hawai'i at 38–39, 889 P.2d at 1097–98). In *Lei*, we found that the delay was unnecessary because the defendant was available to be served, the prosecution did not adduce any evidence that it attempted to serve the defendant or that service would be futile, and perhaps most important, the prosecution had opportunities to serve the defendant and failed to take advantage of them. *Lei*, 95 Hawai'i at 285, 21 P.3d at 887.

Unlike the situation in *Lei*, the prosecution in this case presented testimony regarding the attempts to serve Diaz. The Deputy went to three addresses that Diaz appears to have used. One address was a closed road, and the occupants of the other two had no knowledge of Diaz. Because there was no evidence that the delay in service of the bench warrant was the result of a lack of due diligence on the part of the prosecution, the trial court did not err in excluding the 77 days.

### 2. The trial court did not err in excluding the delay caused by the continuance granted at the request of the prosecution.

 Diaz argues that she did not knowingly waive her HRPP Rule 48 and speedy trial rights. Diaz premises her argument on the idea that waiving the HRPP Rule 48 right is akin to waiving *Tachibana*[18] rights. The colloquy that occurred in the instant case was as follows:

[THE COURT]: Good morning. And what is the defendant's position on the motion to continue?

[DEFENSE COUNSEL]: We have no objection to the State's motion for continuance of trial.

[THE COURT]: And, Ms. Diaz, you understand that the witness is a law student in San Diego and cannot return until this summer. And I've been told by Mr. Agmata that you don't have a problem with continuing the case until the summer. Is that right?

[DIAZ]: Yes.

Diaz suggests that because the court never engaged Diaz in a colloquy in which the court questioned her as to whether she knew she was giving up these rights, her waiver was not knowing, intelligent, or voluntary.

Although this court has never addressed waiver in the context of HRPP Rule 48, the rule itself provides guidance. HRPP Rule 48(c) provides:

(c) Excluded periods. The following periods shall be excluded in computing the time for trial commencement:

. . . .

(3) periods that delay the commencement of trial and are caused by a continuance granted at the request or with the consent of the defendant or defendant's counsel[.]

Thus, the rule only requires consent from either the defendant or the defendant's counsel. In the instant case, both the defense counsel and Diaz consented to the continuance. Because HPD Officer Bumanglag had moved to the mainland and was attending school at the time the prosecution requested the continuance, the days would have been excluded under good cause. Further, because defense counsel and Diaz consented to

**18.** *Tachibana v. State*, 79 Hawai'i 226, 236–37, 900 P.2d 1293, 1303–04 (1995) (holding that the trial court must engage the defendant in a collo-

quy to ensure that the defendant is aware of his right to testify and that if he waives the right to testify he does so knowingly and voluntarily).

the continuance, the trial court did not err when it excluded the 131 days.

### C. Diaz's argument that the cumulative effect of instances of prejudicial error and misconduct denied her right to a fair trial is without merit.

Diaz argues that the cumulative effect of three points of error, resulted in a denial of her right to a fair trial. They are as follows: (1) during cross-examination, the prosecution witness, Officer Bumanglag, improperly referenced another search warrant; (2) the prosecution failed to properly preserve evidence; and (3) the court denied Diaz her right to compulsory process. The issues will be addressed seriatim.

#### 1. Although Officer Bumanglag improperly commented on another search warrant, the error was harmless beyond a reasonable doubt.

■ Diaz argues that Officer Bumanglag's comment on another search warrant was "deliberately calculated to inform the jury that there were other search warrants pending for Diaz." Diaz explains that this comment prejudiced her because

> [a]ny juror with some knowledge of the law would know that a search warrant can only be issued by a judge or magistrate. The jury would conclude that a judge had found probable cause to believe that Diaz was in possession of illegal items other than what was found at Fil–Am Video.

Officer Bumanglag's comment does not amount to reversible error, and, therefore, the trial court's denial of Diaz's motion for a mistrial was not error.

■ Whether improper remarks made by a witness constitute reversible error requires consideration of three factors: " '(1) the nature of the misconduct;' (2) 'the promptness of a curative instruction;' and (3) 'the strength or weakness of the evidence against the defendant.' " *State v. Webster*, 94 Hawai'i 241, 248, 11 P.3d 466, 473 (2000) (quoting *State v. Samuel*, 74 Haw. 141, 148–49, 838 P.2d 1374, 1378 (1992)).

In this instance, the prosecution witness did comment on a warrant which the court had expressly prohibited from evidence. Although Diaz argues that the comment was "deliberate" and "calculated," it does not appear so from the record. Officer Bumanglag's comment was made, not during direct examination, but during cross-examination. Defense counsel, therefore, had control of the manner and structure of the questions he presented. In the context of the questioning, defense counsel asked Officer Bumanglag whether he had read the warrant. He did not ask whether Officer Bumanglag had read the warrant for Fil–Am Video. It was entirely in defense counsel's control to structure the question in a manner that closed off any opportunity for the warrants to be mentioned. The trial court advised defense counsel to tightly lead any witnesses on this matter to prevent opening the door. Moreover, after the trial court denied the motion for mistrial, defense counsel did restructure his questions to engineer the answer he was looking for, *i.e.*, that Diaz's name was not on the Fil–Am Video warrant. Finally, Diaz fails to state how she was prejudiced by the mention of the warrant. Thus, the nature of the misconduct did not rise to the level of being harmful.

Finally, the strength of the evidence against Diaz was significant. She was found in the office of the Fil–Am Video store holding an envelope containing several baggies. She was observed dropping the envelope, and one baggie containing crystal methamphetamine was found in a purse that contained her driver's license and one baggie was found in her coat pocket. Because of the nature of Officer Bumanglag's comment, the context of the cross-examination, and the strength of the evidence against Diaz, Officer Bumanglag's comment was harmless beyond a reasonable doubt.

#### 2. The prosecution did not fail to preserve evidence because opinion testimony without reports, data, or facts is sufficient.

■ Diaz argues that evidence, in the form of a graph, of the chemical analysis of

the crystal methamphetamine was proffered in violation of the best evidence rule, Hawai'i Rules of Evidence (HRE) Rule 1002.[19] Because expert opinion testimony may be introduced without reports, data, or facts, the best evidence rule is not applicable and the graph need not have been admitted.

HRE 703 (1993), entitled "[b]ases of opinion testimony by experts," permits an expert to base "an opinion or inference" upon "facts or data" that "need not be admissible in evidence," provided they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject" and do not otherwise "indicate [a] lack of trustworthiness."

*Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 383, 944 P.2d 1279, 1326 (1997) (quoting HRE Rule 703). Determining whether to permit an expert to testify is left to the discretion of the trial court. Whether testimony was admissible is also a discretionary decision of the trial court. *See State v. Rodrigues*, 67 Haw. 70, 73–74, 679 P.2d 615, 618–19 (1984). We review these decisions under the abuse of discretion standard.

In this case, Officer Brown testified that she had been working in the laboratory testing substances confiscated by police for ten years. She had training, by both the manufacturer and the Federal Drug Enforcement Agency, on the machines that are utilized for testing substances. Officer Brown had been qualified as an expert in over 100 trials. There is no evidence in the record that the trial court abused its discretion in admitting the testimony of Officer Brown; therefore the trial court's ruling permitting this testimony to be introduced is affirmed.

**3. The prosecution did not fail to preserve evidence because Officer Akina's report was not material to Diaz's guilt or innocence.**

Diaz states that HPD Officer Akina testified that she found a packet of "crystal meth" in the pocket of Diaz's coat. Officer Akina completed a police report, which was standard procedure. However, it was not standard procedure to save these reports on the computer. At the time of trial, the HPD was unable to locate the report. Diaz argues that the prosecution failed to preserve evidence and relies on Justice Wakatsuki's concurring opinion in *State v. Matafeo*, 71 Haw. 183, 189, 787 P.2d 671, 674 (1990), in which he states that even if destruction of evidence was through negligence, the jury should be instructed that the evidence should be considered as favorable for the defendant. Although the prosecution failed to preserve evidence, because Diaz failed to demonstrate how a copy of Officer Akina's report was material to her guilt or innocence, we conclude that Officer Akina's report "is not evidence so crucial to the defense that its destruction will necessarily result in a fundamentally unfair trial." *Id.* at 187, 787 P.2d at 673.

In *Matafeo*, we stated:

In *Brady v. Maryland*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution. 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. The *Brady* rule has been incorporated into the Hawai'i due process jurisprudence and relied upon frequently by this court.

*Matafeo*, 71 Haw. at 185–86, 787 P.2d at 672. In *Matafeo*, the defendant "contend[ed] that the complainant's clothing was material evidence favorable to him, in that it would have corroborated his defense that the complainant consented to sexual intercourse." *Id.* at 185, 787 P.2d at 672. Because these clothing items were destroyed, Matafeo argued that his due process rights had been violated and

---

**19.** HRE Rule 1002 provides, "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute." Note that this rule applies only when the effort is to "prove the content of a writing." The Advisory Committee's Note to Fed.R.Evid. 1002 addresses this point: "Thus an event may be proved by nondocumentary evidence, even though a written record of it was made. If, however, the event is sought to be proved by the written record, the rule applies."

that a *Brady* violation occurred. We disagreed, stating that there was no evidence in the record that the clothing would corroborate Matafeo's version that the complainant consented. Moreover, absent a showing that evidence would "create a reasonable doubt about the [defendant's] guilt that would not otherwise exist," no *Brady* violation can be found. *Id.* at 186, 787 P.2d at 673 (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). In *State v. Estrada,* 69 Haw. 204, 215, 738 P.2d 812, 821 (1987), this court identified factors that prevented the defendant from claiming a *Brady* violation. These included the facts that the defense knew of the existence of certain reports prior to the trial, no attempt was made to seek the assistance of the court in obtaining the reports, there was no request for a continuance, and the defendant failed to demonstrate prejudice as a result of the reports being suppressed.

In this situation, Diaz cross-examined Officer Akina about the missing report and made timely objections regarding the missing report. However, Diaz fails to show how the report would have prejudiced her. A total of five baggies with a total weight of 5.189 grams containing crystal methamphetamine were recovered. Four of the baggies were found at the Fil-Am Video store and the fifth, *i.e.,* exhibit 4, was found in Diaz's right coat pocket. Even if the fifth bag was not admitted into evidence, the total weight of the drugs that were admitted was still over the one-eighth of an ounce necessary for a conviction for possession in the second degree. Therefore, even if there was error, it was harmless.

**4. Diaz's right to compulsory process was not violated because the content of the witness's testimony was purely speculative, and Diaz failed to demonstrate how the testimony would benefit her.**

■ Diaz argues that her right to compulsory process was denied when the trial court refused to either order the prosecution to offer the witness immunity for her testimony or pursue an indictment against the witness. Diaz reasons that because Rosqueta was an eyewitness, her testimony regarding the police officer's conduct was relevant. Diaz acknowledges that the court could not compel the prosecution to offer Rosqueta immunity, but argues "it could have given the prosecution the choice of either granting immunity to Rosqueta, or indicting her, or having the State's own witnesses testimony stricken." Because Rosqueta appeared, exercised her right to remain silent, and Diaz failed to offer proof beyond conjecture that Rosqueta's testimony would be helpful to Diaz, we hold that Diaz's right to compulsory process was not violated.

■ A fundamental element of due process of law is the right of compulsory process. *See* Hawai'i Constitution, art. I § 14; U.S. Const. amend. VI; and *State v. Mitake,* 64 Haw. 217, 638 P.2d 324 (1981). Compulsory process protects the defendant's right to obtain witnesses in his favor. *State v. Sequin,* 73 Haw. 331, 341, 832 P.2d 269, 275 (1992). However, this right is subject to limitations, the most important of which, is that the defendant may only obtain witnesses who can give "relevant and beneficial testimony for the defense." *State v. Savitz,* 67 Haw. 59, 60–61, 677 P.2d 465, 466–67 (1984). In *Savitz,* the defense made two offers of proof to establish that the witness would provide relevant and beneficial testimony. First, the witness would testify that the defendant was not at the scene of the burglary for which he was being tried.[20] Second, the witness had a conversation with the prosecution's witness (prior to trial), which would help impeach the prosecution witness. This court ruled that the defense's offer of proof was "purely conjectural and without any foundation nor supported by any basis in fact." *Savitz,* 67 Haw. at 61, 677 P.2d at 467 (citing *Mitake,* 64 Haw. 217, 638 P.2d 324).

The present case is similar to *Savitz* because Diaz fails to set forth any facts that

---

20. The court noted that the defendant-appellant was not convicted of the burglary charge; there-

fore this offer of proof was not relevant.

suggest Rosqueta would have testified in a manner beneficial to Diaz. She states that the police officer's conduct at the video store was relevant to her suppression motion and whether Diaz was searched at the scene are issues that Rosqueta observed. Diaz does not argue that Rosqueta's testimony would be beneficial to the defense, only that she observed these events.

Rosqueta did appear, but she exercised her constitutional right to remain silent. In this case, Diaz's sixth amendment right to compulsory process will not be satisfied at the expense of Rosqueta's fifth amendment right to remain silent. Finally, the decision to prosecute an individual for a particular offense is left to the discretion of the prosecutor. *State v. Radcliffe,* 9 Haw.App. 628, 642–43, 859 P.2d 925, 933 (1993). Because Diaz fails to offer proof sufficient to demonstrate that Rosqueta's testimony would benefit Diaz's defense, Diaz's right to compulsory process was not denied.

5. **When all of the alleged points of error are combined, they do not amount to a violation of Diaz's right to a fair trial.**

▇▇▇ Diaz argues that the cumulative effect of the errors discussed *supra* deprived her of a fair trial. However, after reviewing the alleged errors, we conclude that they did not cumulatively deprive Diaz of a fair trial. Even if Bumanglag's remark regarding the other warrant was improper, Diaz failed to demonstrate how the remark prejudiced her in the context of the three pronged *Webster* analysis. Officer Brown's opinion testimony was sufficient under HRE 703 without a copy of the graph generated by the chemical analysis equipment. And, even if the chain of custody for exhibit 4 cannot be proven and that evidence is not admissible, there was

evidence that Diaz possessed more than one-eighth of an ounce of crystal methamphetamine.

## IV. CONCLUSION

In light of the foregoing, we affirm the judgment of the first circuit court.

Dissenting Opinion of ACOBA, J.

While the majority now apparently agrees with the position herein—that the execution of a search warrant in this case must be subjected to a constitutionally reasonable standard,[1]—I dissent from the holding that police need not demand entry prior to entering a closed interior door. I believe the right of Defendant–Appellant Alicia Diaz (Defendant) to be free from unreasonable searches under article 1, section 7 of the Hawai'i Constitution was violated when the police, without expressly demanding entry, broke through a locked interior office door into the area where she was located and seized evidence from her. Of course, for the sake of consistency, uniformity, and simplicity, in the future, the police are not prohibited from making the three-part announcement, "Police, search warrant, open the door," at closed interior doors that is now required at closed exterior doors.

In my view, before making a forcible entry through a closed inner office door, the police were required to declare their office, announce their business, and *demand entry.* Inasmuch as the police did not demand entry the evidence obtained should have been suppressed. *Cf. State v. Monay,* 85 Hawai'i 282, 284, 943 P.2d 908, 910 (1997) (police officers' failure to properly knock and announce "rendered the entry illegal and required suppression of all items seized"). On that ground, I would reverse the conviction herein.[2]

---

1. Of course Justice Ramil has always espoused this view. *See State v. Harada,* 98 Hawai'i 18, 40, 41 P.3d 174, 196 (2002) ("[T]his court [has] explained, quoting the United States Supreme Court, [that] the knock and announce principle 'is an element of the reasonableness inquiry under the fourth amendment.'" (Quoting *State v.*

*Dixon,* 83 Hawai'i 13, 22, 924 P.2d 181, 190 (1996).)) (Ramil, J. dissenting).

2. Because I believe the evidence should have been suppressed, I do not consider the other issues raised by Defendant.

## I.

## A.

The findings of the court relate the following facts. On December 4, 1998, Honolulu Police Department (HPD) officers executed a search warrant at the Fil–Am Video Store (the store), which was a small building in the industrial area on Nimitz Highway. The search warrant indicated that the police were to look for, among other things, methamphetamine and methamphetamine paraphernalia. When the officers arrived at 6:24 p.m., the store was "open," as indicated by a sign, but its front door was closed and a man was exiting the store. The officers detained the man and entered the store with him. They did not announce their presence from outside the store.

Upon entering the store, the police identified themselves and stated that they had a search warrant. After securing the front portion of the store, the officers walked to a closed and locked office door, knocked, and announced three times, "[P]olice department, search warrant." After fifteen seconds without a response, one of the officers kicked in the office door. Defendant was inside the office, sitting in a chair with her back to the officers. Defendant slowly turned toward the officers and dropped a white envelope to the floor. Once Defendant was detained, the officers discovered several clear ziplock baggies containing crystal methamphetamine inside the envelope. The police also found

---

**3.** For the text of HRS § 803–37, see section II., *infra*.

**4.** Article 1, section 7 states:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

**5.** The findings stated in part as follows:

*FINDINGS OF FACT*

. . . .

---

drug paraphernalia in Defendant's purse, in her jacket pocket, and on a shelf in the office.

It is unclear as to whether the police made the requisite pronouncements before forcibly breaking the interior door. Only one police officer testified that Officer Richardson said, "Police, search warrant, *open the door*," but other witnesses, including Officer Richardson himself, testified that Richardson merely said, "[P]olice department, search warrant." The court made no findings as to whether Officer Richardson demanded entry prior to forcible entry.

## B.

Defendant was indicted on October 27, 1999, on charges of promoting a dangerous drug in the second degree, Hawai'i Revised Statutes (HRS) § 712–1242(1)(b)(i) (1993) and unlawful use of drug paraphernalia, HRS § 329–43.5(a) (1993). On July 27, 2000, Defendant filed a "Motion to Suppress Items of Evidence," seeking suppression of several items recovered by the police in the course of executing the search warrant. Defendant contended that, in the execution of the warrant, the police officers violated HRS § 803–37 (1993) [3] and article 1, section 7 of the state constitution [4] when they entered the exterior of the building and when they entered the interior office door. The court denied the motion to suppress evidence. The August 3, 2000 amended findings reflected much of what is described *supra*,[5] and the court entered the following relevant amended conclusions:

4. Fil–Am Video is a video-rental business establishment which was open for business at the time the police arrived and entered. A sign saying "Open" was located at the front of the store facing outward to the public. *The front door to the business establishment was in a closed position but unlocked.*

5. . . . *[Officer Richardson] did not knock and announce his office and mission or demand entry before he entered the front door.* As he entered or upon entering, Officer Richardson identified himself verbally and by showing his badge and announced that he was serving a search warrant.

. . . .

7. Officer Richardson asked the man who had returned to Fil–Am Video *whether a closed door on the makai side of the store was the door to the office.* The man said yes. *Officer Richardson then knocked on the locked door and announced*

*CONCLUSIONS OF LAW*

1. The knock-and-announce requirement contained in Section 803–37, [HRS], did not apply to the police as they sought to enter Fil–Am Video to serve the search warrant at issue. The Court considers, among other things, the policy reasons underlying the knock-and-announce rule, which are to notify the person inside of the presence of police and the *impending intrusion, give that person time to respond, avoid violence, and protect privacy as much as possible.* Under the facts of this case, police actions in regard to the knock-and-announce rule were consistent with the rule's underlying policy reasons and requirements, and were reasonable.

2. Pursuant to *State v. Balberdi,* 90 Haw.App. [sic] 16 (1995), under Section 803–37, [HRS], the knock-and-announce language with regard to inner doors *is discretionary. Therefore, the fact that Officer Richardson did not demand entry at Fil–Am Video's inner office door is not fatal to the validity of the search.*

. . . .

(Emphases added.)

A jury convicted Defendant of both counts.

**II.**

HRS § 803–37, governing the execution of search warrants, reads as follows:

**Power of officer serving.** The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without de- . manding permission if the officer finds it open. If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. *When entered, the officer may demand that any other part of the house, or any closet, or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them.*

(Boldfaced font in original.) (Emphasis added.) In making its decision the court relied on *State v. Balberdi,* 90 Hawai'i 16, 975 P.2d 773 (App.1999). In that case, the Intermediate Court of Appeals (ICA) held that the term "may," as used in HRS § 803–37 that states that the officer "may demand . . . [that] closed place[s] . . . be opened," was *"non-mandatory, i.e., . . . discretionary." Id.* at 22, 975 P.2d at 779. In *Balberdi,* police officers, executing a search warrant for narcotics, announced their presence, and then entered through the front door of a residence. *See id.* at 18, 975 P.2d at 775. The police apparently opened or kicked open the closed door to the defendant's bedroom without demanding entry and upon entering the bedroom, the defendant was found sleeping. Three packets of crystal methamphetamine were in the room. *See id.* Based upon its construction of the term "may," the ICA concluded that the announcement requirements in the preceding part of the statute to be given "upon initial entry" at the front door, *id.,* need not be given at interior closed doors. *See id.* at 21, 975 P.2d at 778.

Insofar as the ICA held that "may" signifies that the police have discretion to announce or not to announce at closed inner doors, I must disagree. The plain language of HRS § 803–37 does *not* grant police such discretion. I agree that the word "may" connotes discretion. *See Gray v. Administrative Dir. of the Court,* 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) ("[T]he close proximity of the contrasting verbs 'may' and 'shall' requires a non-mandatory, i.e., a discretionary, construction of the term 'may.' "). The

---

"*Police, search warrant.*" He did this three times and waited for some response. Getting no response, Officer Richardson kicked in the door. The procedure from the first knock to the kicking in of the door spanned 15 seconds.

8. Once in the office, Officer Richardson identified himself, verbally and by warrant. . . .

. . . .

(Emphases added.)

question, however, is to what that discretion relates. In my view, the word "may" merely provides officers the discretion to seek entry into closed places. Considered in context, the reference in HRS § 803–37 to demands for opening closed places "after entry" assumes that the officer had made such demands upon those persons situated at the exterior of the closed spaces, *i.e.*, those occupants of the building whom the officer had already encountered and who presumably had been informed of the search by the initial knock and announcement at the front door, not upon those persons who occupied the "closed places." [6]

## III.

### A.

HRS § 803–37 is essentially silent with respect to what procedure, if any, is required of the police when faced with a closed inner door.[7] However, the execution of a search warrant must be constitutionally reasonable and, hence, constitutional considerations apply, a proposition which the majority now apparently agrees with and applies to this case. *Cf. Wilson v. Arkansas*, 514 U.S. 927, 931, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) ("[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable . . . [and an] examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering." (Internal quotation marks and citations omitted.)). Likewise, "inherent in an analysis of our constitution's counterpart of the Fourth Amendment is the premise that the execution of a search warrant must be reasonable, inasmuch as an unreasonable execution of a warrant . . . will invalidate the

subsequent search and the fruits thereby obtained." *State v. Harada*, 98 Hawai'i 18, 44, 41 P.3d 174, 201 (2002) (Acoba, J., concurring in part and dissenting in part) (emphasis omitted). Therefore, under article 1, section 7 of our constitution, the focus is on whether the officer's actions are constitutionally reasonable. *See State v. Garcia*, 77 Hawai'i 461, 467, 887 P.2d 671, 677 (App.1995) ("The objective here being a search, the constitution mandates that police conduct in executing a search warrant must be reasonable."). Indeed, " '[t]he standards by which any governmental search is to be judged is always its reasonableness, in light of the constitutional guarantee of freedom from unreasonable searches and seizures.' " *Id.* (quoting *State v. Martinez*, 59 Haw. 366, 368, 580 P.2d 1282, 1284 (1978)).

"The purpose[s] of the knock-and-announce rule [are] to notify the person inside of the presence of the police and of the impending intrusion, give that person time to respond, avoid violence, and protect privacy as much as possible." *Garcia*, 77 Hawai'i at 468, 887 P.2d at 678 (quoting *People v. Condon*, 148 Ill.2d 96, 103, 170 Ill.Dec. 271, 274, 592 N.E.2d 951, 954 (1992), *cert. denied*, 507 U.S. 948, 113 S.Ct. 1359, 122 L.Ed.2d 738 (1993)) (quotation marks and brackets omitted). *See State v. Eleneki*, 92 Hawai'i 562, 566, 993 P.2d 1191, 1195 (2000) (explaining the three purposes of the knock and announce rule); *State v. Dixon*, 83 Hawai'i 13, 22, 924 P.2d 181, 190 (1996) (purpose of the knock and announce rule are to avoid violence, limit property damage and protection of an individual's right to privacy).

The officers' actions in the instant case cannot be deemed reasonable. While the store premises were purportedly open to the public, the office decidedly was not. As the police ascertained, the door was closed and locked. The court found that the police knocked and announced their office, but

---

**6.** The circuit court in this case should not be faulted inasmuch as it was bound by precedent as embodied in *Balberdi*.

**7.** I believe the application of terms such as "open" and "shut" in applying a statute such as

HRS § 803–37, must be determined in the context of a specific case. *See Harada*, 98 Hawai'i at 52 n. 1, 41 P.3d at 208 n. 1 (Acoba, J., concurring in part and dissenting in part).

made no finding that they demanded entrance before breaking the door down. The shut and locked office door was obviously meant to exclude the public. Under such circumstances, the officers' failure to demand entry once they found the office door shut was not a reasonable exercise of their power.

## B.

This court has held that, "where a breaking occurs or force is used, officers are required to comply with applicable knock and announce requirements regardless of whether they are executing a search or an arrest warrant." *Harada*, 98 Hawai'i at 23, 41 P.3d at 179. It was said that the cases "demonstrate that the use of force in gaining entry is not only relevant to whether the knock and announce statute is implicated, it is a primary factor in making such determination." *Id.* at 24, 41 P.3d at 180. Therefore, in our jurisdiction, "where force is used to gain entry, the statute is implicated." *Id.* In that regard, "the requirements of the knock and announce rule are not met when police officers *fail to orally demand entry* [.]" *Id.* at 29, 41 P.3d at 185 (emphasis added).

Relatedly, under article I, section 7 of our constitution, the occupants of an area that is the subject of a search warrant must be given notice of the coming intrusion and a reasonable time to respond to the pronouncements, absent exigent circumstances.[8] *See Garcia*, 77 Hawai'i at 467, 887 P.2d at 677. Thus, "the amount of time allowed to lapse between announcement [by the police] and entry is relevant in determining the reasonableness of the officers' conduct in executing a search warrant [before they enter by force]." *Id.* (brackets, internal quotation marks, citation, and ellipsis points omitted). *See also State v. Mallan*, 86 Hawai'i 440, 448, 950 P.2d 178, 186 (1998) (stating that, " '[a]s the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution, we are free to give broader privacy protection than that given by the federal constitution,' " and that, "unlike the federal constitution, our state constitution contains a specific provision expressly establishing the right to privacy as a constitutional right" (quoting *State v. Kam*, 69 Haw. 483, 491, 748 P.2d 372, 377 (1988)) (emphasis omitted)).

In that regard, "such pronouncements are intended to notify the occupants of an impending intrusion and to afford the occupants the opportunity to open the door, *see Garcia*, 77 Hawai'i at 468, 887 P.2d at 678; hence, the requirement that the officer must first '*demand entrance*,' *id.* at 466, 887 P.2d at 676 (emphasis added), when the door is shut." *Harada*, 98 Hawai'i at 49, 41 P.3d at 205 (Acoba, J., concurring in part and dissenting in part). The majority concludes that the phrase "police department, search warrant" is sufficient because it "gave notice of their presence, authority, and impending intrusion." Majority opinion at 221. 58 P.3d at 1268. However, as was said with respect to analogous situations in which the "knock and announce" statute is applied, "we know of no more effective way of complying with [demanding entry] than that the demand be orally communicated in the same way the police announce their office and purpose." *Garcia*, 77 Hawai'i at 466, 887 P.2d at 676. Indeed, "the burden of making an express announcement is certainly slight and a few more words by the officers would … satisf[y]" the purposes for such a demand. *Id.* (internal quotation marks and brackets omitted). In light of these considerations, the police "announce[ment,]" *see* majority opinion at 20, does not reasonably satisfy a demand for entry for several reasons.

## IV.

## A.

A demand that the occupants open the door would dispel any doubt or confusion likely to arise from an imminent, unexpected intrusion by the police. By requiring that police expressly demand entry, there would be no question in either the minds of the

---

**8.** Exigent circumstances are not involved in this case.

police or the occupants that a response is required and that the occupants will be afforded the opportunity to act on the demand. The lack of an appropriate announcement also may risk confusion and, thus, the precipitation of violence. *See Garcia,* 77 Hawai'i at 468, 887 P.2d at 678 ("The purpose of the knock-and-announce rule is to ... avoid violence.").

Hence, a separate and distinct request for entry is a necessary condition for the reasonable execution of a warrant in light of (1) the purposes served by a knock and announce rule and (2) the right afforded to individuals under our constitution to a reasonable time to respond in order to avoid a forcible entry. *See State v. Quesnel,* 79 Hawai'i 185, 191, 900 P.2d 182, 191 (App.1995) ("If the occupants are not afforded a reasonable time to respond, the entry and the ensuing search and seizure are illegal and the evidence seized must be suppressed."); *Garcia,* 77 Hawai'i at 470, 887 P.2d at 680 (suppressing evidence because police failed to give reasonable amount of time between knocking and entering through door).

### B.

Moreover, the underlying purposes of "knock and announce" requirements are as germane to an entry at a closed exterior door as they are to a closed inner door. Hence, the pronouncements made at the exterior door should reasonably be constitutionally mandated at a closed interior door. It would appear evident that the purposes served by the rule may prevail not only when a home is involved but when other "closed places" are forcibly entered.

For example, a likelihood exists that persons behind a closed interior door may not have heard an earlier pronouncement at an exterior door, if made.[9] Moreover, it would

serve no relevant or viable principle in practice or in the implementation of such pronouncements to hold that the police need demand entry at an exterior door but not at an interior one. The reasonableness requirement in the warrant clause dictates that the police make all three statements. Of course, for the purpose of consistency, uniformity, and simplicity, the police may choose to make the three-part announcement at both closed exterior doors and at closed interior doors.

### V.

The majority also apparently agrees that the breaking of a locked interior door without pronouncement pays no heed to the protection of an occupant's right to privacy. *See* majority opinion at 221–222, 58 P.3d at 1268–1269. A contrary approach would invite the unannounced forcible entry by the police into "closed places" imbued with constitutional privacy protections. *See State v. Bonnell,* 75 Haw. 124, 146, 856 P.2d 1265, 1277 (1993) (employees have a reasonable expectation of privacy in an employee break room, apart from the common area of the post office); *State v. Biggar,* 68 Haw. 404, 407, 716 P.2d 493, 495 (1986) (defendant had a reasonable expectation of privacy inside a closed toilet stall, recognizable by society as objectively reasonable); *State v. Lo,* 66 Haw. 653, 661, 675 P.2d 754, 760 (1983) ("[A] hotel room ostensibly serving as someone's temporary abode is a 'private place' ... [and the person] is 'entitled to privacy therein[.]' "); *Ortega v. O'Connor,* 764 F.2d 703, 705–06 (9th Cir. 1985) (an employee has a reasonable expectation of privacy within his or her office), *rev'd on other grounds,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); *Tatman v. State,* 320 A.2d 750, 750 (Del.1974) (police must knock and announce at an apartment door as well as a building's outer door in order to fulfil the purpose of the rule, namely

---

**9.** A majority of the cases supporting the "no knock and announce rule" at interior doors is grounded on the assumption that a knock and announce occurred at an exterior door. However, in this case, no knock and announce occurred at the exterior door. While it is true that the detectives announced themselves upon entering

the store, it is not apparent that the Defendant, who was inside the office, was so informed. In any particular case, the size of the store or location of the office may make an initial announcement wholly ineffective in fulfilling the purposes of the knock and announce requirements.

to 1) protect privacy and 2) reduce the danger to citizen and police by notifying the purpose of the entry); *Duckworth v. Sayad,* 670 S.W.2d 88, 92 (Mo.Ct.App.1984) (conduct in a dormitory room, which was visible only from a particular spot on an outside balcony, was protected by a constitutional right of privacy); *People v. Lerhinan,* 90 A.D.2d 74, 455 N.Y.S.2d 822, 824–26 (N.Y.App.Div.1982) (a guest in a hotel room is entitled to protection of the Fourth Amendment and an employee of a hotel cannot consent to a search).

The majority's position would otherwise be contrary to the protection we have long afforded privacy rights under our constitution. *See, e.g., State v. Navas,* 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996) (explaining that article I, section 7 affords a "more extensive right of privacy" than that of the United States Constitution); *State v. Lopez,* 78 Hawai'i 433, 445, 896 P.2d 889, 901 (1995) ("In the area of searches and seizures under article I, section 7, we have often exercised th[e] freedom" to "provide broader protection under our state constitution."); *State v. Enos,* 68 Haw. 509, 511, 720 P.2d 1012, 1014 (1986) (noting that "parallel State constitutional provision[s]" were interpreted differently than the federal constitution); *State v. Tanaka,* 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai'i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights."). A different holding would sanction the breaking into closed spaces and ignore purposes that are fundamental to the reasonable execution of a search warrant that inhere in the "knock and announce" rule. "It is, after all, intrusion by *government* that we are concerned with, not simply the act of opening a door." *Harada,* 98 Hawai'i at 52, 41 P.3d at 208 (Acoba, J., concurring in part and dissenting in part) (emphasis in original).

## VI.

Because I disagree that the police were not required to demand entry at the closed and locked interior office door under the circumstances of this case, I would reverse the court's denial of Defendant's motion to suppress evidence and, therefore, would also reverse the judgment of conviction.