11 P.3d 466

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Tarval G. WEBSTER, Defendant–Appellant.**

No. 23039.

Supreme Court of Hawai'i.

Oct. 24, 2000.

242

Keith S. Shigetomi, on the briefs, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, on the briefs, City and County of Honolulu, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that the conviction of Defendant–Appellant Tarval G. Webster (Defendant) of the offense of Carrying, Using[,] or Threatening to Use a Firearm in the Commission of a Separate Felony, Hawai'i Revised Statutes (HRS) § 134–6(a)[1] and

---

1. HRS § 134–6(a) provides as follows:

    **Carrying or use of firearm in the commission of a separate felony; place to keep firearms; loaded firearms; penalty.** (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not;

(e) (Supp.1998),[2] the separate felony being Assault in the Second Degree, HRS § 707–711(1)(a) (1993), against Roman Villanueva, must be vacated because there was no substantial evidence that Defendant caused substantial bodily injury to Roman, that type of injury being an element of Assault in the Second Degree under subsection (a) of HRS § 707–711(1).

Defendant was charged in a March 19, 1998 Oʻahu grand jury indictment with: Attempted Murder in the Second Degree, in violation of HRS §§ 705–500(2) (1993), 707–701.5 (1993), and 706–656 (Supp.1999) (Count I); Carrying, Using[,] or Threatening to Use a Firearm in the Commission of a Separate Felony, in violation of HRS § 134–6(a) and (e) (Count II); Place to Keep Pistol or Revolver, in violation of HRS § 134–6(c) and (e) (Count III); Reckless Endangering in the First Degree, in violation of HRS §§ 707–713 (1993) and 706–660.1(3) (1993) (Counts IV—VI); and Terroristic Threatening in the First Degree, in violation of HRS §§ 707–715 (1993) and –716 (1993) (Count VII).

Count II pertained to Roman and alleged as follows:

> On or about the 1st day of July, 1997, in the City and County of Honolulu, State of Hawaiʻi[,] TARVAL G. WEBSTER did knowingly carry on his person or have within his immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not, thereby committing the offense of Carrying, Using[,] or Threatening to Use a Firearm in the Commission of a Separate Felony, in violation of Sections 134–6(a) and (e) of the

Hawaiʻi Revised Statutes, and *the separate felony is Assault in the Second Degree,* in which the elements are that *TARVAL G. WEBSTER did intentionally or knowingly cause substantial bodily injury to Roman Villanueva, thereby committing the offense of Assault in the Second Degree, in violation of Section 707–711(1)(a)* of the Hawaiʻi Revised Statutes.

(Emphases added.)

On May 3, 1999, the jury returned verdicts of guilty of the lesser included offense of Attempted Assault in the First Degree (Count I), of guilty as charged of Use of a Firearm in the Commission of a Felony (Count II), of Place to Keep Pistol or Revolver (Count III), and of three counts of Reckless Endangering in the First Degree (Counts IV—VI), and of not guilty of Terroristic Threatening in the First Degree (Count VII). Defendant was sentenced to an indeterminate maximum ten-year prison term with a mandatory minimum of ten years (Count I), an indeterminate maximum twenty-year term (Count II), an indeterminate maximum ten-year term (Count III), and three five-year indeterminate maximum prison terms with mandatory minimum terms of five years (Counts IV to VI), all to be served concurrently.

On appeal, Defendant contends (1) that, as to Count II, there was no substantial evidence to show Roman suffered substantial bodily injury or that Defendant intentionally or knowingly caused such injury, and (2) that the reference in the testimony of Detective Harold Fitchett to a polygraph examination

---

provided that a person shall not be prosecuted under this subsection where the separate felony is:
(1) A felony offense otherwise defined by this chapter;
(2) The felony offense of reckless endangering in the first degree under section 707–713;
(3) The felony offense of terroristic threatening in the first degree under section 707–716(1)(a), 707–716(1)(b), and 707–716(1)(d); or
(4) The felony offenses of criminal property damage in the first degree under section 708–820 and criminal property damage in the second degree under section 708–821

and the firearm is the instrument or means by which the property damage is caused.

**2.** HRS § 134–6(e) provides as follows:

(e) Any person violating subsection (a) or (b) shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or revolver, shall be guilty of a class C felony.

given to one Carlson Yamamoto denied Defendant a fair trial.

## I.

The following pertinent evidence was adduced with respect to Count II. Leila Amaral testified that, on July 1, 1997, she and Roman arrived at their apartment at about 11:15 p.m. Leila saw a white van parked in her stall. A group of people were outside the apartment. Roman told Leila the group included Defendant and Shannon Kane, known as "Sleepy."

Subsequently, Roman's friend, Kenneth Morris, entered the apartment, grabbed a knife, and asked Roman to go outside and help Morris fight. Leila grabbed the knife away from Morris. Leila heard Sleepy's voice from outside say, "Guns, guns, you guys get guns." Morris yelled back, "Why you guys got to bring guns, why you guys got to bring out guns for, just fight up and up." Leila heard a van start up, Morris opened a door, and threw a pipe outside. Roman and Morris sat down on a couch in the living room near the living room window. Minutes later, Leila heard three gunshots. Roman said he was hit.

Roman testified that, prior to July 1, 1997, Roman and Morris had "rip[ped] off" crystal methamphetamine from Defendant. Roman later saw Defendant and there was no "bad blood" between them. Roman generally verified Leila's testimony as to the events at the apartment on July 1, 1997. Roman related he heard what sounded like fireworks, felt a "tingling" sensation on the left side of his head, and a ringing in his ear.

Morris testified he sat next to Roman in the living room and three or four gunshots come through the apartment window, one shot went past him, another shot went over their heads, and one shot went between Roman and him. Later, Defendant apologized to Morris and asked Morris not to testify against him. Defendant disclosed that he used a .22 caliber weapon and that he was shooting for Morris.

Pugera Ganapathy, M.D., a physician, treated Roman at the St. Francis West emergency room. Dr. Ganapathy initially testi-fied that Roman had a scalp "abrasion." Later, Dr. Ganapathy described Roman's injury as a "partial laceration." Finally, Dr. Ganapathy opined that the injury was a "major avulsion, laceration, or penetration of the skin." On cross-examination, Dr. Ganapathy admitted that he described the injury to the police as an abrasion to the scalp. He treated the abrasion with an antibiotic ointment.

Dr. Ganapathy's testimony on direct examination was as follows:

Q. [PROSECUTOR] Doctor, going back to July 2nd of 1997 in the early morning hours, did you treat a person named Roman Villanueva?

A. Yes, I did.

Q. And where did you treat Mr. Villanueva?

A. In the emergency room at Saint Francis West.

Q. Did you observe any injury to him that morning?

A. He had a scalp abrasion on the left parietal area.

Q. Was that an abrasion or a laceration?

A. That's a partial laceration. Abrasion is when just the skin is gone. This was full thickness, so it's a partial laceration.

Q. What is a laceration?

A. A laceration is when the skin is split.

Q. *Did the injury that you observed on Mr. Villanueva on July 12th, [sic] 1997, did that injury cause a major avulsion, laceration[,] or penetration of the skin?*

A. *Yes, it did.*

Q. Do you know—or were you told what caused that laceration?

A. The history I got was that it was probably a gunshot wound.

(Emphases added.)

He testified on cross-examination as follows:

Q. [DEFENSE COUNSEL] You talked about abrasions versus lacerations, can you tell us what an abrasion is?

A. An abrasion is when the skin and the dermis get[ ] scraped off.

Q. So kind of like a scrape, like when you skin your knee type of thing?

A. Right.

Q. And you said a laceration is more when the skin is split?

A. Right.

Q. Now, when you told us that it was probably a gunshot wound, that was just based on what you were told; is that correct?

A. That's correct.

Q. Okay. You didn't do anything more than just to observe an injury and to treat it; is that correct?

A. Correct.

Q. And you were asked to prepare a report for the Honolulu Police Department; is that right?

A. That's correct.

Q. *And in the report for the Honolulu Police Department, they asked you what was the diagnosis, in other words, please explain the patient's injuries in both medical and maintenance [sic] terms.*

A. That's correct.

Q. *Okay. And when you filled out that form, you filled out that there was an abrasion of the scalp; is that correct?*

A. *That's correct.*

Q. *And the treatment for this abrasion to the scalp was antibiotic ointment?*

A. *Yes, that's correct.*

Q. You treated with antibiotic ointment and you covered it?

A. That's correct.

Q. And that was the extent of your treatment?

A. That's correct, yes. I had to transfer him out of the hospital because our CAT scan machine was down.

Q. You wanted to take precautions to see if there were other more serious—

A. Correct.

. . . .

Q. *All you know is that you treated him for an abrasion with antibiotic ointment; is that right?*

A. *Yes.*

(Emphases added.)

No other evidence concerning Roman's injuries was received.

## II.

■ HRS § 707–711(1)(a) and (2) states as follows:

**Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:

(a) The person intentionally or knowingly causes substantial bodily injury to another[.]

. . . .

(2) Assault in the second degree is a class C felony.

"Substantial bodily injury" is defined in HRS § 707–700 as bodily injury which causes:

(1) A major avulsion, laceration, or penetration of the skin;

(2) A chemical, electrical, friction, or scalding burn of second degree severity;

(3) A bone fracture;

(4) A serious concussion; or

(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

Under the evidence, the court instructed the jury, pursuant to agreement of the parties, that substantial bodily injury in this case "mean[t] bodily injury which causes a major avulsion, laceration, or penetration of the skin, or a bone fracture."

■ We observe that the term "major" in HRS § 707–700(1) modifies "avulsion, laceration, or penetration of the skin"; thus,

a plain reading of HRS § 707–700 imposes a requirement that a laceration must be "major" in order to fall within the scope of the definition. In this context, the definition of "major" as "greater as in size, amount, extent, or rank" would appear to apply. *The Random House College Dictionary* 807 (rev. ed.1979). This definition finds support in the legislature's intent to "account for injuries which are far more serious than mere bodily injury but do not approximate a risk of death or permanent

loss or disfigurement" in the definition of "substantial bodily injury." Hse. Conf. Comm. Rep. No. 51, in 1986 House Journal, at 937.

*State v. Tanielu,* 82 Hawai'i 373, 379–80, 922 P.2d 986, 992–93 (App.1996). Assuming Roman suffered a laceration, there is no substantial evidence it was "major," that is, one " 'far more serious than mere bodily injury.' " *Id.* at 379, 922 P.2d at 992 (quoting Hse. Conf. Comm. Rep. No. 51, in 1986 House Journal, at 937). Dr. Ganapathy initially testified the injury was an abrasion. An abrasion, in the context of an injury, is defined as "the rubbing or scraping of the surface layer of cells or tissue from an area of the skin or mucous membrane." *Webster's Third New International Dictionary* 5 (1961). According to the doctor, he reported to the police that the injury was an abrasion, not a laceration; and the entire treatment rendered was to apply an "antibiotic ointment." This testimony, taken together with Roman's testimony that he only felt a "tingling" sensation on the left side of his head, belies the conclusion that Roman suffered substantial bodily injury.

■ Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to reach a conclusion." *In re John Doe,* 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994). The evidence concerning Roman's injury was not of "sufficient quality and probative value to enable a [person] of reasonable caution to reach [the] conclusion," *id.,* that there was a major laceration, or, assuming a *"partial* laceration," (emphasis

added), as testified to by Dr. Ganapathy, that it was "far more serious than mere bodily injury." *Tanielu,* 82 Hawai'i at 379, 922 P.2d at 992 (internal quotation marks and citation omitted).

While the abrasion or "partial laceration" was not a substantial bodily injury as defined in HRS § 707–700, it was "bodily injury." Bodily injury is defined in HRS § 707–700 as "physical pain, illness, or any impairment of physical condition" and conceivably would encompass an abrasion or a partial laceration under the circumstances related by the doctor. Bodily injury is an element of Assault in the Second Degree as defined in HRS § 707–711(d), [3] that is, when "[t]he person [accused] intentionally or knowingly cause[d] bodily injury to another person with a dangerous instrument[.]" While HRS § 707–711(d) posits less injury to the "bodily integrity of the person," it is apparently "[t]he danger represented by the use of a dangerous instrument," commentary on HRS § 707–710 to –712, which justifies the imposition of a felony status in such circumstances. However, the prosecution did not charge the HRS § 707–711(d) version of assault in the second degree in the indictment and, thus, understandably did not pursue that subsection in its questioning of Dr. Ganapathy.

■ There being a lack of substantial evidence to support a conviction of Assault in the Second Degree under HRS § 707–711(1)(a), the separate felony alleged in Count II, there was *a fortiori* a lack of substantial evidence to convict Defendant of having used a firearm in the commission of a

---

**3.** The remaining parts of HRS § 707–711(1) not reproduced *supra* state:

**Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:

. . .

(b) The person recklessly causes serious bodily injury to another person;

(c) The person intentionally or knowingly causes *bodily injury* to a correctional worker, as defined in section 710–1031(2), who is engaged in the performance of duty or who is within a correctional facility;

(d) *The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument;* or

(e) The person intentionally or knowingly causes *bodily injury* to an educational work-

er who is engaged in the performance of duty or who is within an educational facility. For the purposes of this section, "educational worker" means· any administrator, specialist, counselor, teacher, or employee of the department of education, or a person who is a volunteer in a school program, activity, or function that is established, sanctioned, or approved by the department of education or a person hired by the department of education on a contractual basis and engaged in carrying out an educational function.

(Emphases added.) Obviously, Roman was not acting as a correctional or educational worker at the time of the incident.

felony as charged in Count II. "When an offense [such as HRS § 134–6(a) ] requires the actual commission of an underlying crime, ... the [prosecution] is required to prove all of the conduct, attendant circumstances, and results of conduct that comprise the underlying crime." *State v. Israel,* 78 Hawai'i 66, 74, 890 P.2d 303, 311 (1995). *See State v. Christian,* 88 Hawai'i 407, 431–32, 967 P.2d 239, 263–64 (1998). "Thus, the phrase 'while engaged in the commission of a felony' contained in [HRS § 134–6(a) ] incorporates all of the elements of whichever underlying felony was allegedly being committed." *State v. Ganal,* 81 Hawai'i 358, 371, 917 P.2d 370, 383 (1996). Because the prosecution failed to prove the "result[ ] of [the] conduct [i.e., substantial bodily injury] that comprise[d] the underlying crime," *Israel,* 78 Hawai'i at 74, 890 P.2d at 311, of assault in the second degree as defined in HRS § 707–711(1)(a), the conviction on Count II must be vacated. That being the case, we need not decide Defendant's alternative challenge to his conviction on that count.

### III.

■ The following pertinent evidence was adduced with respect to the polygraph reference.

Detective Fitchett received a telephone call from Yamamoto, who claimed to know about the case. Fitchett took a statement from Yamamoto on December 19, 1997, and escorted him to a polygraph examination at the police station, apparently for purposes of verifying the statement. At that time, Yamamoto provided several pages of handwritten notes to Fitchett.

At trial, Detective Fitchett testified as follows:

> [FITCHETT] Carlson Yamamoto phoned me with some information that he had regarding a homicide case that I was investigating.
>
> Q.[PROSECUTOR] All right. And did you take a statement from Carlson Yamamoto on December 19th, 1997?
>
> A. Yes, I did.

> Q. And on December 20th, 1997, did you have further contact with Carlson Yamamoto?
>
> A. Yes, I did.
>
> Q. What type of contact?
>
> A. We picked him up and escorted him back to the police station to take a polygraph examination regarding the statement he made the day prior.
>
> Q. And at that time did he hand you these handwritten notes?
>
> A. Yes, he did.

No contemporaneous objection was made to Detective Fitchett's "polygraph" reference. However, defense counsel, in a later part of Fitchett's direct examination, raised the possibility of a mistrial motion, and the court subsequently issued a cautionary instruction to the jury:

> [DEFENSE COUNSEL] ... Now I guess while I'm up here [at a bench conference], in terms of what Detective Fitchett mentioned about the polygraph, I don't want to say anything that—can we have it cleared up it had nothing to do with the investigation?
>
> [PROSECUTOR] Sure, but it did.
>
> [DEFENSE COUNSEL] Well, in the sense that—you know what I'm saying. I mean, I just want—I want that part cleared up or I'm gonna have to move for a mistrial.
>
> . . . .
>
> [PROSECUTOR] What about a cautionary instruction instead? They're not to speculate and to consider any evidence concerning polygraph. I'm afraid to ask him anything.
>
> . . . .
>
> [DEFENSE COUNSEL] I don't know what he's gonna say, that's why I need to talk with him. We can take a real fast recess.
>
> [PROSECUTOR] Why don't we do it that way, safer.
>
> (End of bench conference)
>
> THE COURT: We're gonna take a very short recess, ladies and gentlemen.
>
> (Recess taken.)

248

THE COURT: Ladies and gentlemen, reference has been made to a possible polygraph examination. Polygraph examinations are not admissible as evidence. You are instructed to disregard any testimony regarding a polygraph examination. That testimony is ordered stricken.

Do not speculate on one, the purposes of a polygraph exam, two[,] any questions administered as part of the polygraph exam, and three, the results of any polygraph exam.

The handwritten notes provided by Yamamoto were admitted in evidence as State's Exhibit Nos. 35, 36, and 37. The parties later stipulated to the testimony of a handwriting expert who concluded Defendant was the author of the notes. At this point, defense counsel moved for mistrial because of the polygraph reference. The court denied the motion.

The notes stated as follows:

One day in Waipahu I was at home. My friend Kai told me to come over to record CDs onto cassette tapes that I wanted to make D–D–L–E's of, and I said okay. So when I got to his house I started to record, and him and his cousin, RC, went up the road while I stayed back. So I ended up falling asleep while waiting for them to return. So all I remember was waking up with police in the house with my friend, Kai, and RC and his mom in the living room. And the police said there was shooting and people said that we, as in me, RC[,] and Kai, was [sic] the ones how [sic?] did it. And after we told them we wasn't [sic] the ones, the police left the house. This happened about a half a year ago. But in this car I was driving recently, they said they found shells that matched the same shooting in Waipahu.

State's Exhibit 37.

*What I wrote on the other paper was what I told detectives. The part where I said my friends went up the road, I went with them and I shot up this guy's house because he ripped me off.* And after that had happened I went back to Kai's house and then police came a little while after to Kai's and by that time I was sleeping, so they woke me up and questioned us about the shooting and after that they had left the house and that was it.

State's Exhibit 36 (emphasis added).

Attempted—.22 cal semiautomatic.

State's Exhibit 35.

On appeal, Defendant complains that "[t]he reference to the polygraph examination led jurors to believe that Yamamoto passed a polygraph examination" and, thus, "improperly bolstered Fitchett's testimony." As the prosecution maintains, "the statement was limited in nature and was stricken, a curative instruction was promptly given[,] followed by the court's second admonition to disregard any stricken testimony." A trial court has the discretion to determine whether the challenged statement "merits a mere prophylactic cautionary instruction or the radical surgery of declaring a mistrial." *State v. Kahinu*, 53 Haw. 536, 540, 498 P.2d 635, 644 (1972).

In determining whether improper remarks made by a witness constitutes reversible error, the appellate court will consider: (1) "the nature of the misconduct"; (2) "the promptness of a curative instruction, or lack of it"; and (3) "the strength or weakness of the evidence against the defendant." *State v. Samuel*, 74 Haw. 141, 148–49, 838 P.2d 1374, 1378 (1992) (internal quotation marks and citation omitted). Here, Detective Fitchett's "misconduct" in mentioning the polygraph examination was apparently inadvertent. In any event, nothing in the record indicates otherwise. The court timely struck Fitchett's answer and subsequently issued a cautionary instruction to the jury to disregard the reference to a polygraph examination and to refrain from speculating as to its purpose or result. A jury is presumed to follow the court's instructions. *State v. Cardus*, 86 Hawai'i 426, 438, 949 P.2d 1047, 1059 (App.1997) (holding that any potential prejudicial effect a statement would have had on the jury was eliminated by the judge's instruction); *Samuel*, 74 Haw. at 149 n. 2, 838 P.2d at 1378 n. 2 (" '[E]ven though a prosecutor's remarks may have been improper, any harm or prejudice resulting to the defendant can be cured by the court's instructions to the jury. In such cases it will be presumed

that the jury adhered to the court's instructions.' ") (quoting *State v. Amorin*, 58 Haw. 623, 629, 574 P.2d 895, 899 (1978)). Finally, there was ample evidence that Defendant used a firearm to shoot into an apartment occupied by the persons mentioned in the indictment. Under these circumstances, Defendant was not denied a fair trial.

### IV.

For the foregoing reasons, we vacate Defendant's conviction on Count II but affirm his convictions on all other counts. The case is remanded to the court to amend the November 19, 1999 judgment of conviction and sentence accordingly.