STATE OF HAWAI`I, Plaintiff-Appellee,
v.
ANTHONY KASSEBEER, JR., Defendant-Appellant.
No. 27660
Intermediate Court of Appeals of Hawaii.
February 29, 2008.
Joseph R. Mottl, III, for Defendant-Appellant.
Stephen K. Tsushima, Deputy Prosecuting Attorney, City and County of Honolulu, for Plaintiff-Appellee.

MEMORANDUM OPINION
WATANABE, Presiding Judge, FOLEY, and NAKAMURA, JJ.
Defendant-Appellant Anthony Kassebeer, (Kassebeer) was found guilty by a jury of first degree sexual assault, in violation of Hawaii Revised Statutes (HRS) § 707-730(1)(a) (Supp. 2007),[1] and kidnapping, in violation of HRS § 707-720(1)(e) (1993).[2] The jury could not reach a unanimous verdict on the additional charge of third degree sexual assault.
The complaining witness (CW) for all three charges was Kassebeer's wife at the time of the alleged offenses. Kassebeer and the CW had voluntarily separated and had been living apart for about a month. According to the CW, Kassebeer entered her apartment in the early morning on April 10, 2004, and physically assaulted her in an attempt to induce her to admit that she was having an affair. Kassebeer went back to the apartment in the afternoon on that same day, approximately ten hours later, and allegedly committed the charged sexual assaults and kidnapping. Kassebeer did not brandish any weapon during the kidnapping, but in the CW's presence, he alluded to his gun in a phone conversation with a friend. A handgun was later recovered by the police in the apartment.
The Circuit Court of the First Circuit (circuit court),[3] sentenced Kassebeer to concurrent terms of imprisonment of twenty years for the first degree sexual assault and ten years for the kidnapping. Kassebeer appeals from the Judgment entered on November 16, 2005.
On appeal, Kassebeer argues that the circuit court erred by: 1) admitting the handgun into evidence; 2) denying his motion in limine to exclude, as a prior bad act, evidence that he physically abused the CW during the early morning on April 10, 2004; 3) denying Kassebeer's motions for mistrial when witnesses referred to Kassebeer's physical abuse of the CW before April 10, 2004; 4) failing to give a specific unanimity instruction for the kidnapping charge; 5) communicating its assumption that an offense had been committed; and 5) preventing effective cross-examination of prosecution witnesses. We affirm.

BACKGROUND

I. The Prosecution's Evidence
Kassebeer and the CW had been married for six years and had two children. In mid-March 2004, they agreed to separate, and Kassebeer moved out of the couple's Pearl City apartment and began residing with his sister. After the separation, the couple remained in contact and had consensual sex on at least one occasion about a week before the charged offenses.
At about 10:30 p.m. on April 9, 2004, the CW was driving her truck to pick up her friend, Tabatha Hashimoto-Matautia (Tabatha), who worked at the Hilton Hawaiian Village Kassebeer was in a car with his friends, Andrew Kim (Andrew) and Chris Freitas (Chris). Kassebeer saw the CW's truck and directed Chris, who was driving, to follow the CW. The CW parked in front of the Hilton's lobby, and Kassebeer got out of the car and approached her. The CW refused to open her window to talk to Kassebeer, and when she began to drive away, Kassebeer jumped into the bed of the truck. Kassebeer noticed that the CW had a black eye and a cut lip.
After unsuccessfully seeking the assistance of hotel security guards, the CW stopped the truck and opened her door. Kassebeer questioned the CW about the injuries to her face and accused her of having a boyfriend. Kassebeer stated, "[I]f I can't have [the CW], nobody else can . . . ." In the meantime, Tabatha joined the CW in the truck, and they drove off the Hilton premises. Kassebeer followed the CW in Chris's car and repeatedly contacted the CW through her Nextel phone, which had a walkie-talkie feature, calling her "slut" and other disparaging names. The CW returned to the Hilton parking lot and called the police, but when the police arrived, Kassebeer could not be located.
Kassebeer and Andrew decided to go to the CW's Pearl City apartment to search for evidence that the CW was having an affair. They were still there in the early morning on April 10, 2004, when the CW arrived home. The CW had gone to Zippy's restaurant with Tabatha and left for home at about 2:00 a.m. The CW was talking on her cellular phone with Tabatha when the CW entered her apartment. Kassebeer grabbed the CW from behind as she walked down a hallway. He forced the CW to the ground, hit her head on the tile, took her phone away, hit her on the chin with the phone, and held her down on the ground. Before the phone cut off, Tabatha heard the CW scream, and Tabatha called the police and the CW's parents.
The CW described Kassebeer as "angry and psychotic." Kassebeer spoke to the CW and demanded to know, "[W]ho are you fucking[?] [W]ho are you fucking[?]" The CW got off the floor. With Andrew attempting to act as a buffer, Kassebeer confronted the CW with items he believed indicated she was having an affair. Eventually, the police arrived. The CW did not ask that Kassebeer be arrested but only that Kassebeer be required to leave. The CW's father, who had also arrived, took Kassebeer to the father's house.
The CW and Tabatha planned to meet for lunch later that same day (April 10, 2004). The CW called Tabatha about fifteen minutes past noon, and they agreed to meet at the CW's apartment. Tabatha called the CW while Tabatha was on her way to the apartment. The CW told Tabatha that the CW would leave the front door unlocked because the CW had to use the bathroom.
As the CW came out of the bathroom, she encountered Kassebeer. The CW asked Kassebeer to leave and told him that Tabatha was coming. Kassebeer replied, "I'll leave after you give me what I want," and he started taking off his clothes.
The CW told Kassebeer "no." Kassebeer called the CW a "fucking bitch," told her to "shut the fuck up," and repeatedly raised his fists in a threatening manner as if he was going to hit her. Kassebeer told the CW to get on the bed, and he took off her clothes. The CW testified that Kassebeer pushed her down on the bed and raped her by inserting his penis into her vagina. She also testified that Kassebeer fondled her breast. Kassebeer ignored the CW's plea that he stop.
When Kassebeer had finished, the CW heard Tabatha knocking on the door. The door was locked. The CW ran to the door, opened it, and told Tabatha to call the police because Kassebeer had just raped her. Kassebeer appeared behind the CW, slammed the door shut, and locked the top latch. Tabatha called the police on her cellular telephone and reported that the CW had been raped. Tabatha asked the police to "please hurry."
The CW asked Kassebeer to let her leave the apartment, but he refused. The CW testified that she wanted to leave but did not because Kassebeer had just raped her and she assumed "the next step was to kill me." At one point, the CW tried to lock Kassebeer out of the bedroom so she could escape through a sliding door, but he stopped her. Kassebeer attempted to move a dresser to barricade the CW in the room but was unable to move the dresser far enough to block the door.
While Kassebeer and the CW were in the apartment, Kassebeer called Andrew. The CW overheard Kassebeer's side of the conversation. Kassebeer told Andrew that he had found the gun that Andrew had tried to hide from Kassebeer. Andrew had previously dismantled Kassebeer's gun and hidden a piece of it out of concern that Kassebeer was depressed and should not be in possession of a gun. Kassebeer told Andrew that "this is going to be a hostage situation and the only person who can negotiate me out of this is you." Kassebeer also called Tabatha and accused her of calling the police. Kassebeer told Tabatha that he had the CW barricaded in the room and that "[y]ou want to make this a hostage situation, I'll make this a hostage situation . .. ."
The CW estimated that it was about 30 to 60 minutes from the time that Kassebeer slammed the door shut on Tabatha until the police arrived. When the police arrived, they knocked on the front door but no one answered. The police instructed Tabatha to call the apartment and instruct Kassebeer to open the door or the police would knock it down. In response to Tabatha's call, the CW promised Kassebeer that if he let the CW leave the apartment, she would act like nothing happened. They then opened the door.
The CW initially told the police that everything was okay and that the police could leave. However, Officer Barbara Donato noticed that "[the CW's] eyes were watery, like she had just finished crying[,] [h]er voice was shaking, [and] her hands were trembling." Once the CW was separated from Kassebeer, she started crying frantically, grabbed Officer Donato's arms, and begged the officer not to leave her alone. Officer Donato searched the bedroom and found a loaded handgun between the bed mattress and the box spring.

II. The Defense Case
Kassebeer testified that he thought the CW was dating someone else and it bothered him. His suspicions were heightened when he saw the injuries to the CW's face on April 9, 2004, and received conflicting versions from the CW and Tabatha on how the injuries had occurred. Kassebeer admitted that he and Andrew went to the CW's apartment in the early morning on April 10, 2004, to look for evidence that the CW was having an affair. Kassebeer stated that after the CW arrived home that morning, he took the CW to the ground because she began screaming and yelling when she saw him. He denied hitting the CW's head to the floor and indicated that when they struggled over the CW's cell phone, she hit herself on the chin with the phone. Kassebeer testified that he "never meant to cause [the CW] any harm or pain."
With respect to the incident later that day in the afternoon on April 10, 2004, Kassebeer testified that he went back to the apartment to talk to the CW. He stated that she began comforting him and they had consensual sex. Kassebeer stated that the CW answered the front door when Tabatha knocked and that the CW, and not he, closed the door when Tabatha turned and started walking to the parking lot. Kassebeer asserted that the CW invited him to lunch with Tabatha, and he indicated that the CW remained in the apartment of her own volition. While acknowledging that the gun found in the bedroom was his gun, Kassebeer denied that he ever intended to use it against the CW. Kassebeer testified that he had carried the gun for protection against the CW's suspected boyfriend when he went to the apartment in the early morning and had simply left the gun there.
The defense also called Dr. Nadine Tan-Salle, a physician with the Sex Abuse Treatment Center, who examined the CW on April 10, 2004. Dr. Tan-Salle testified that her examination of the CW's genital area revealed that it was normal, without lesions, trauma, or bruising. She further testified that it is not out of the ordinary in sex assault cases to have normal findings and see no trauma to any of the sex organs. According to Dr. Tan-Salle, the CW reported that "ejaculation took place both inside her body orifice as well as outside" and the CW denied that she had been fondled. Dr. Tan-Salle described the CW as being "very shaken," "scared," and "anxious."

DISCUSSION

I.
Kassebeer argues that the circuit court abused its discretion in admitting his handgun into evidence because it was irrelevant and more prejudicial than probative. We disagree.
At the outset, we note that Kassebeer did not object to testimony about the handgun and its recovery from the bedroom, but only to the admission of the handgun itself. The handgun, Exhibit 11, was not offered in evidence until the testimony about the handgun had been completed. By not asserting a timely objection to the testimony about the handgun, Kassebeer waived his right to challenge this testimony. See Hawaii Rules of Evidence (HRE) Rule 103(a)(1) (1993) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection . . . ."). Because the jury had already heard testimony that Kassebeer referred to his gun during his phone conversation with Andrew and that the handgun had been recovered at the apartment, any prejudice flowing from the admission of the handgun itself was minimal.
In any event, even if Kassebeer had preserved his right to challenge the admission of testimony about the handgun as well as the handgun itself, the circuit court did not abuse its discretion in admitting such evidence. The gun-related evidence was relevant to prove Kassebeer's culpable state of mind in committing the charged offenses. The evidence showed that a loaded handgun, which Kassebeer had brought to the apartment, was found in the bedroom hidden under the mattress. The evidence further showed that in the CW's presence, Kassebeer called Andrew, referred to finding a gun that Andrew had hidden, and stated "this is going to be a hostage situation . .
Based on this evidence, the jury could reasonably infer that Kassebeer had planned to rape and kidnap the CW and had brought the gun to embolden himself and as protection should he encounter resistence from the CW or others in committing these crimes. In addition, the kidnapping charge required proof that Kassebeer intentionally or knowingly restrained the CW with the intent to terrorize her. For purposes of the kidnapping statute, "restrain" means to "restrict a person's movement in such a manner as to interfere substantially with the person's liberty. . . poly means of force, threat, or deception[.]" HRS § 707-700 (1993).
The evidence relating to Kassebeer's handgun was relevant to show his intent to terrorize the CW and to restrain her by means of threat. Kassebeer's act of bringing a handgun to the apartment made it more likely that he intended to terrorize the CW. The gun provided him with an easy means of terrorizing the CW and securing her compliance should difficulties arise. In addition, the jury could reasonably view Kassebeer's reference to finding the gun in his phone conversation with Andrew as an implied threat to the CW that she was in a "hostage situation" and that Kassebeer had a gun available for use if she attempted to escape. The recovery of the gun in a location accessible to Kassebeer showed that this implicit threat could have been carried out.
Kassebeer cites no authority for the proposition that where testimony about a gun is relevant, a court nevertheless abuses its discretion in admitting the gun itself as physical evidence. We hold that the circuit court did not err in admitting the gun-related evidence.

II.

A.
Prior to trial, Plaintiff-Appellee State of Hawai`i (the State) filed a notice, pursuant to HRE Rule 404(b) (Supp. 2007), of its intent to use at trial evidence of prior uncharged assaults that Kassebeer allegedly committed against the CW. The State specifically identified the early morning incident on April 10, 2004 (hereinafter, the "early morning incident"), in which Kassebeer allegedly "slammed the back of [the CW's] head into the floor and hit her with her phone," as one of the prior bad acts it intended to introduce. The State also identified numerous other incidents prior to April 10, 2004, in which Kassebeer had allegedly abused the CW, including incidents in which he allegedly slammed her head into a closet and opened a cut that required fifteen stitches, held a gun to her head and then pistol-whipped her thigh, and tried to hit her with a baseball bat.
Kassebeer moved in limine to exclude evidence of his alleged prior bad acts. In response to Kassebeer's motion, the State agreed not to introduce evidence of Kassebeer's prior physical abuse of the CW, except for evidence relating to the early morning incident. The circuit court denied Kassebeer's motion in limine as to the early morning incident, but granted the motion as to the other prior incidents of alleged abuse.
On appeal, Kassebeer argues that the circuit court erred in denying the portion of his motion in limine that sought to exclude, as a prior bad act, evidence that he physically abused the CW during the early morning incident. We disagree.
HRE Rule 404(b) provides in relevant part that:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.
In State v. Steger, 114 Hawai`i 162, 172, 158 P.3d 280, 290 (App. 2006), we stated:
Under HRE Rule 404(b), "other bad act" evidence is admissible when: 1) it is relevant to any fact of consequence other than the defendant's propensity to commit the crime charged; and 2) its probative value is not substantially outweighed by the danger of unfair prejudice.
The early morning incident took place only about ten hours before the charged sexual assaults and kidnapping. As described by the CW, the early morning incident demonstrated that Kassebeer was obsessed with and enraged by his belief that his wife was having an affair. Under HRE Rule 404(b), evidence of the early morning incident was relevant and admissible for the non-criminal-propensity purposes of showing Kassebeer's motives and intent in committing the subsequent charged offenses. It showed that Kassebeer's motives for the sexual assaults and kidnapping were jealousy and the desire to punish the CW and that Kassebeer acted with the intent to terrorize her.
Evidence of the early morning incident was also admissible under HRE Rule 404(b) to show the CW's state of mind and whether she was subject to strong compulsion, consented to the sexual intercourse, and was involuntarily restrained. State v. Burkhart, 5 Haw. App. 26, 27-28, 675 P.2d 811, 812 (1984). In Burkhart, the defendant was charged with sexual abuse and kidnapping. At trial, the complaining witness was permitted to testify that prior to the alleged offenses, the defendant informed the complaining witness that the defendant had just been released from San Quentin, where the defendant had been incarcerated for five years. Id. at 27, 675 P.2d at 811. This court upheld the admission of that testimony under HRE Rule 404(b), concluding as follows:
It is undisputed that the only factual issue below was whether the complaining witness was an involuntarily restrained and forcibly compelled victim or a voluntary, willing participant. The complaining witness's knowledge and state of mind are dispositively relevant to that issue. It is further undisputed that the outcome of this case turned exclusively upon the credibility of the complaining witness and defendant. Consequently, we agree with the lower court that the evidence complained of was more probative than prejudicial and, thus, admissible.
Id. at 28, 675 P.2d at 812.
Under circumstances similar to Kassebeer's case, other jurisdictions have likewise held that evidence of the defendant's earlier abuse of the victim is admissible in a rape prosecution to show forcible compulsion or the lack of the victim's consent. See Stevenson v. State, 619 A.2d 155, 160-62 (Md. Ct. Spec. App. 1993); Commonwealth v. Richter, 711 A.2d 464, 466-67 (Pa. 1998).

B.
Kassebeer contends that absent evidence of the early morning incident, he might have chosen to rely on the defense of reasonable doubt as to whether he used strong compulsion[4] instead of claiming that the CW consented to the sexual intercourse. He thus contends that the court erred in permitting evidence of the early morning incident in the State's case-in-chief because the admission of this evidence forced him to testify, in violation of his constitutional right not to testify. We note that in the trial court, Kassebeer viewed the two defenses  reasonable doubt as to the element of strong compulsion and the Curtis consent to the sexual intercourse  as essentially the same:
The Court: What is your defense in this case, [Defense Counsel]?
[Defense Counsel]: Essentially, reasonable doubt that the forcible sexual encounter was not forcible. It was consensual. And we have as such  we have to establish a motive for her fabrication 
The Court: That being the case, that is  your defense is consent?
[Defense Counsel]: Yes. . . . .
[Defense Counsel]: Your Honor, issue I'd like to raise, in effect, are defense's consent. Yet, I believe, essentially, the defense consent is a failure of the prosecution to prove forcible acts beyond a reasonable doubt. So, in effect, we would submit that our defense is reasonable doubt or a negative of the prima facie case.
In any event, we fail to see how the distinction between the defense of reasonable doubt regarding the element of strong compulsion and the defense of consent affects our HRE Rule 404(b) analysis. The early morning incident was relevant and admissible in the State's case-in-chief even if Kassebeer's sole defense to the first degree sexual assault charge was reasonable doubt as to whether Kassebeer used strong compulsion.

III.
Kassebeer argues that the circuit court erred when it denied his motions for mistrial in response to testimony by Tabatha and the CW that indicated he committed prior acts of domestic abuse against the CW. Following each challenged testimony, the circuit court sustained Kassebeer's objection, struck the witness's testimony, and instructed the jury to disregard the testimony. Kassebeer's motions for mistrial were prompted by testimony given in the following contexts:
1. The prosecutor asked Tabatha to explain her testimony that on the night of April 9, 2004, Kassebeer appeared more concerned that the CW had a boyfriend who caused the injuries to the CW's face than the fact that she was injured.
[Prosecutor]: And why do you say that?
[Tabatha]: Because [Kassebeer] kept saying, oh, what, your other boyfriend did that to you, huh? Oh, what, you leave me because I hit you, and you go to somebody else who hit you?
(Emphasis added.)
2. The prosecutor asked the CW to explain her marital status with Kassebeer at the time of the charged offenses, and the CW responded as follows:
[Prosecutor]: So you two were physically apart, separated.
[The CW]: Yes.
[Prosecutor]: Were there any like separation papers filed or anything like that?
[The CW]: I had filed for divorce, but I didn't turn in the paperwork yet.
[Prosecutor]: Any why not?
[The CW]: Because he was trying to say that he would change, he wouldn't hit me anymore, he 
(Emphasis added.)
3. The prosecutor questioned the CW about her encounter with Kassebeer at the Hilton Hawaiian Village on April 9, 2004, and the CW gave the following answers:
[Prosecutor]: Now, did [Kassebeer] ever get  or did [Kassebeer] ever get inside your truck?
[The CW]: Yes, I believe he did. And then he was telling me who hit me, this and that.
[Prosecutor]: So he accused you of having 
[The CW]: Having another boyfriend to abuse me.[5]
(Emphasis added.)
Generally, the trial court "has the discretion to determine whether the challenged statement merits a mere prophylactic cautionary instruction or the radical surgery of declaring a mistrial." State v. Webster, 94 Hawaii 241, 248, 11 P.3d 466, 473 (2000) (internal quotation marks omitted) (citing State v. Kahinu, 53 Haw. 536, 549-50, 498 P.2d 635, 644 (1972)). When determining whether a witness's improper remark requires the declaration of a mistrial, we look at three factors: "[1] the nature of the misconduct[;] [2] the promptness of a curative instruction or lack of it[;] and [3] the strength or weakness of the evidence against the defendant." State v. Samuel, 74 Haw. 141, 148-49, 838 P.2d 1374, 1378 (1992).
Here, the record shows that the challenged testimony was inadvertent and not the result of an attempt by the prosecution or the witnesses to inject prejudicial testimony. On each occasion, the court promptly struck the testimony and instructed the jury to disregard it. See State v. Cardus, 86 Hawai`i 426, 438, 949 P.2d 1047, 1059 (1997) (concluding that the jury is presumed to follow the court's instruction to disregard certain testimony). Moreover, after the third occasion, the court gave an additional curative instruction, modified at Kassebeer's request, that emphasized that the jury's task was to dispassionately determine whether the State had proven the charges beyond a reasonable doubt, and not to determine whether Kassebeer was a good or bad husband. Finally, there was strong and persuasive evidence of Kassebeer's guilt. Under these circumstances, we conclude that the circuit court did not abuse its discretion in denying Kassebeer's motions for mistrial. See State v. Loa, 83 Hawai`i 335, 353-54, 926 P.2d 1258, 1276-77 (1996) (upholding the denial of a mistrial in light of the trial court's immediate cautionary instruction and the strong evidence of the defendant's guilt); State v. Diaz, 100 Hawaii 210, 224, 58 P.3d 1257, 1271 (2002); Samuel, 74 Haw. at 149, 838 P.2d at 1378-79.

IV.
The early morning incident was always viewed in the trial court as an uncharged prior act. The State listed this incident in its HRE Rule 404(b) notice. None of the trial participants, including Kassebeer, suggested that the early morning incident could possibly form the basis for the kidnapping charge. Moreover, the State made clear in its closing argument that the kidnapping charge was based on Kassebeer's conduct during the incident in the afternoon on April 10, 2004 (hereinafter, the "afternoon incident").
Nevertheless, on appeal, Kassebeer argues for the first time that evidence that he tackled the CW and briefly held her on the ground during the early morning incident could satisfy the elements for kidnapping. He thus contends that the circuit court committed plain error in failing to give a specific unanimity jury instruction for the kidnapping charge. We disagree.
Even assuming arguendo that evidence of the early morning incident was sufficient to support a kidnapping charge, any error in failing to provide a specific unanimity instruction did not prejudice Kassebeer or affect his substantial rights. In contrast to the strong evidence of kidnapping based on the afternoon incident, the evidence of kidnapping based on the early morning incident was tenuous at best. Given the way that the trial evidence was presented and argued to the jury, there is no reasonable possibility that any error in failing to give a specific unanimity instruction contributed to Kassebeer's kidnapping conviction. See State v. Gonsalves, 108 Hawai`i 289, 292-93, 119 P.3d 597, 600-01 (2005).

V.
The circuit court sustained Kassebeer's objection to the prosecutor's question to Officer Barbara Donato regarding whether the officer knew "when the incident happened to [the CW]." In explaining its ruling, the court commented that "[Officer Donato] has no personal knowledge because she wasn't there at any time of the offense." (Emphasis added.)
Kassebeer claims that the circuit court's inadvertent reference in its ruling to "the offense," rather than "the alleged offense," requires that his conviction be vacated. Kassebeer contends that by referring to "the offense," the court communicated to the jury that the court assumed an offense had been committed and thereby denied Kassebeer his right to a fair trial. Kassebeer's claim is without merit.
We conclude that the court's brief reference to "the offense" was innocuous and could not have resulted in any meaningful prejudice to Kassebeer. The alleged prejudice flowing from the court's comment apparently escaped the attention of Kassebeer's counsel, who did not raise an objection at the time, and we do not believe the comment had any effect on the jury. The circuit court instructed the jury to disregard any remark made by the court, unless it was an instruction, and to disregard anything the court had said or done that suggested it was inclined to favor either party or indicated it held an opinion on what facts had been established. The court's instructions, which the jury is presumed to have followed, neutralized any possible prejudice from the court's stray remark. See State v. Hauge, 103 Hawaii 38, 59, 79 P.3d 131, 152 (2003).

VI.
Kassebeer argues that the circuit court erred in preventing him from effectively confronting and cross-examining prosecution witnesses. We disagree.
The circuit court properly sustained the State's objection to Kassebeer's question to Officer Donato about whether "[the CW] told you that the injuries you saw were from a prior incident?" The court sustained the objection on the ground of lack of foundation because the CW's injuries had come from several different incidents and Kassebeer had not identified the particular injury to which he was referring. In addition, Kassebeer's question clearly called for inadmissible hearsay and was objectionable on that ground.
We also conclude that the circuit court did not deny Kassebeer his right of confrontation and cross-examination by cutting off a line of questioning in his cross-examination of the CW and in permitting the CW to complete her answer to one of his questions. Our review of the record establishes that the court's actions did not prevent Kassebeer from effectively confronting and cross-examining the CW. Kassebeer was given ample opportunity to bring out alleged inconsistencies in the CW's testimony and to attack her credibility.

CONCLUSION
The November 16, 2005, Judgment of the circuit court is affirmed.
NOTES
[1] Hawaii Revised Statutes (HRS) § 707-730(1)(a) (Supp. 2007) provides:

(1) A person commits the offense of sexual assault in the first degree if:
(a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion[.]
[2] HRS § 707-720 (1)(e) (1993) provides, in relevant part:

(1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
. . .
(e) Terrorize that person . . . [.]
[3] The Honorable Dexter D. Del Rosario presided.
[4] The charge of first degree sexual assault against Defendant-Appellant Anthony Kassebeer, Jr. (Kassebeer) required proof that he "knowingly subject[ed] [the complaining witness (CW)] to an act of sexual penetration by strong compulsion[.]" HRS § 707-730(1)(a) (emphasis added).
[5] Kassebeer objected to this answer on the theory that it implied that Kassebeer had been abusing the CW. The prosecutor responded that he did not see that implication. The circuit court, "in abundance of caution," struck the answer.